**A/C ELECTRIC COMPANY, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondent.**

**No. 91–3366.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 1, 1991.

Decided Dec. 20, 1991.*

Brett L. Thurman (briefed and argued), Coolidge, Wall, Womsley & Lombard, Dayton, Ohio, for petitioner.

Ray Darling, Secretary, OSHRC, Daniel J. Mick, U.S. Dept. of Labor, Office of the Sol., Washington, D.C., Maureen M. Cafferkey, William S. Kloepfer, Office of the Sol., U.S. Dept. of Labor, Cleveland, Ohio, Charles F. James (briefed and argued), Office of the Dept. of Labor, Washington, D.C., for respondent.

Before RYAN and BOGGS, Circuit Judges, and HOOD, District Judge.**

PER CURIAM.

A/C Electric Company petitions this court to reverse an order of the Occupational Safety and Health Review Commission that holds it liable for various violations of federal regulations that occurred during the construction of an apartment complex. A/C admits that violations occurred, but argues that it should not be

* This decision was originally issued as an "unpublished decision" filed on December 20, 1991. On January 21, 1992, the court designated the opinion as one recommended for full-text publication.

** The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

held responsible for them. Finding no error in the administrative proceedings, we affirm.

## I

A/C Electric Company specializes in electrical subcontracting; its principal office is located in Memphis, Tennessee. In the fall of 1988, it began its first job in Ohio, working on the construction of an apartment complex in northern Cincinnati called "Arbors of Montgomery." The general contractor on the project was Trammel Crow; A/C was to install and maintain temporary electrical service and wire the project. A/C was the only electrical subcontractor on the site, and all subcontractors on the site used the temporary electrical service it provided. A/C had three on-site employees: Clyde "Doyle" Treece, the job superintendent; Don Seiler, Jr., an electrical apprentice; and Jim Hammock.

Due to an employee complaint, John Boylan, a compliance officer with the Occupational Safety and Health Administration (OSHA), began an inspection of the jobsite on April 14, 1989. As a result of Mr. Boylan's inspection, the Secretary of Labor issued a serious citation to A/C on May 16, 1989. The citation alleged violations of seven construction safety standards under the Occupational Safety and Health Act, 29 U.S.C. §§ 651–78. The first item, involving hard hats, has not been contested. Items two through five alleged violations of the electrical standards contained in 29 C.F.R. § 1926. Specifically, they addressed a lack of outer covers and dead fronts for electric service panel boxes; a failure to utilize ground fault circuit interrupters or an assured equipment grounding program; a lack of clamps or bushings where conductors entered panel boxes; and a failure to protect panel boxes from getting wet. Items six and seven alleged violations of scaffolding regulations: a failure to plank tightly the working platform of a scaffold upon which an employee was working, and a failure to provide an access ladder for the scaffold. The Secretary defined all violations as serious and proposed $3,250 in penalties.

A/C contested the citation, and a hearing was held before an Administrative Law Judge. At the hearing, A/C did not deny that the violations had occurred. Instead, it claimed that it was not liable for the hazardous conditions relating to the electrical system, because it did not create them and because its employees were not exposed to them. A/C claimed that it was not liable for the hazardous scaffold conditions, because it had no knowledge that its employee was going to perform his work on the scaffold in question. After a careful analysis of the facts, the ALJ affirmed the citation in full. A/C petitioned the Occupational Safety and Health Review Commission for review. However, when no Commission member directed review within thirty days, the ALJ's decision became the final order of the Commission. 29 U.S.C. § 661(j). A/C next petitioned this court to reverse the final order. 29 U.S.C. § 660(a).

## II

To achieve its purposes, the Occupational Safety and Health Act provides that the Secretary of Labor may promulgate safety and health standards and requires each employer to comply with these standards. 29 U.S.C. §§ 654(a)(2), 665. The Secretary has delegated her responsibilities under the Act to the Assistant Secretary for Occupational Safety and Health, who heads OSHA. *See generally Martin v. Occupational Safety and Health Review Comm'n,* —— U.S. ——, 111 S.Ct. 1171, 1174, 113 L.Ed.2d 117 (1991).

The Occupational Safety and Health Review Commission carries out adjudicatory functions under the Act. 29 U.S.C. § 651(b)(3). We outlined our standards for reviewing factual findings of the Commission in *Empire–Detroit Steel v. Occupational Safety and Health Review Comm'n,* 579 F.2d 378, 383 (6th Cir.1978):

> [W]e note that 29 U.S.C. § 660(a) requires that "findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." Substantial evidence was

defined by this court ... as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moreover, adjudicatory conclusions of the Commission can be set aside only when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."

(citations omitted). *See also National Eng'g & Contracting Co. v. Occupational Safety and Health Review Comm'n*, 838 F.2d 815, 817 (6th Cir.1987).

The first item of the citation disputed by A/C alleges a violation of 29 C.F.R. § 1926.403(i)(2)(ii).[1] To comply with this rule, each electrical box should have had an inner cover, called a "dead front," which exposes only the face of the circuit breakers to the user. Each box also should have had a removable outer cover designed to enclose the entire face of the box and protect it from damage. However, the ALJ found that these conditions had not been met in this case:

> Dead fronts were missing from several of the panel boxes. In one case, the dead front was lying near the panel box, but in the other cases, the dead fronts were not to be seen. In three instances, the outer covers of the panel boxes were missing.

The Secretary of Labor argues that the lack of dead fronts and covers on the panel boxes exposed employees to the danger of electrocution from contact with energized components of the boxes.

Having considered all of the evidence, the ALJ admitted that the "record is unclear as to who created the hazardous conditions." However, he concluded that he could uphold the citation without determining culpability:

> A/C was in control of the hazardous conditions. It was the electrical subcontractor on the site and responsible for the temporary electrical service. A/C had the responsibility to maintain the temporary service and inspected it every Monday. The fact that A/C inspected the electrical service is, in essence, an admission that it was responsible for the service. The contract for the job specified that A/C agreed to protect the work from deterioration or damage. The panel boxes were clearly under A/C's control.

Because A/C controlled the boxes, according to the ALJ, it is liable for violations resulting from their improper maintenance.

The ALJ used a similar legal analysis to decide whether A/C was responsible for the other electrical violations noted in the citation. The next alleged violation involved 29 C.F.R. § 1926.404(b)(1)(ii), which provides that electricity on construction sites must be sufficiently grounded.[2] Devices such as ground-fault circuit interrupters (GFCI's) protect workers against electrocution from an electrical fault or short in a tool or any exposed bare wire. Once again, the testimony established that a violation had occurred, and A/C denied any fault. The ALJ rejected A/C's argument, ruling once again that as the electrical subcontractor, A/C was responsible for electrical violations.

The next electrical citation alleged a violation of 29 C.F.R. § 1926.405(b)(1), which requires circuit panel boxes to be equipped with clamps or bushings where conductors enter the boxes.[3] Such a rule prevents

---

**1.** This section states: "In locations where electric equipment would be exposed to physical damage, enclosures or guards shall be so arranged and of such strength as to prevent such damage."

**2.** This section states: "All 120–volt, single-phase, 15– and 20–ampere receptacle outlets on construction sites, which are not a part of the permanent wiring of the building or structure and which are in use by employees, shall have approved ground-fault circuit interrupters for personnel protection. Receptacles on a two-wire, single-phase portable or vehicle-mounted generator rated not more than 5kW, where the circuit conductors of the generator are insulated from the generator frame and all other grounded surfaces, need not be protected with ground-fault circuit interrupters."

**3.** This section states: "Conductors entering boxes, cabinets, or fittings shall be protected from abrasion, and openings through which conductors enter shall be effectively closed. Unused openings in cabinets, boxes, and fittings shall also be effectively closed."

conductors from being cut through, which could cause shock or even electrocution. A/C blamed others, arguing that workers beyond its control removed the clamps and bushings while trying to bypass the GFCI's. However, the ALJ concluded that A/C was responsible for the boxes. Thus, he upheld the citation. The final electrical citation alleged a violation of 29 C.F.R. § 1926.405(e)(1), which mandates that panel boxes be constructed in such manner that no water can enter them.[4] There was apparently no dispute that several boxes contained accumulations of water and mud. Based on this evidence, the ALJ upheld the citation.

■ Before this court, A/C makes one argument in response to all citations for electrical violations. It insists that it could never have complied with the regulations and therefore should not be held liable. A/C argues that by repairing the boxes on a regular basis and reporting the ongoing tampering problems to the job superintendent, it had fulfilled its responsibility. It claims that a mere contract recital that it "controlled" the electrical services hardly means that it had actual control. Mr. Treece, an A/C employee, told Mr. Boylan that "[t]he only thing I know to do [to protect the boxes] is to stand there with a two-by-four." A/C argues that liability should rest with the party responsible for causing the problem or a party that failed to deal with the problem after being notified of its existence. It insists that the Commission's interpretation of its regulations places small subcontractors in a hopeless position. "[U]nder this interpretation of the Occupational Safety and Health Act, those subcontractors at multi-employer jobsites who make reasonable efforts to strive for compliance will be punished, even though they took all reasonable steps to prevent others from committing safety violations." Petitioner's Brief at 7.

These arguments are not supported by precedent, and have been rejected in several cases. In *Bechtel Power Corp. v. Secretary of Labor*, 548 F.2d 248 (8th Cir.1977), Bechtel contended that it was not subject to 29 C.F.R. §§ 1926 *et seq.*, because its employees were not performing the actual construction work, and merely worked in a managerial or supervisory capacity. Bechtel sought to rely on *Anning–Johnson Co. v. Occupational Safety and Health Review Comm'n*, 516 F.2d 1081 (7th Cir.1975), which held that subcontractors on a multi-employer construction site were not liable for the exposure of their employees to violations that the subcontractors neither created nor were responsible for under their contract. The Eighth Circuit distinguished *Anning–Johnson*, however, and noted that "Bechtel ... was contractually responsible for the construction site's safety program and thus possessed the power to protect its employees." 548 F.2d at 249. *Brennan v. Occupational Safety and Health Review Comm'n (Underhill Constr. Corp.)*, 513 F.2d 1032 (2d Cir.1975), addressed the question of whether a violation of the Act requires evidence of direct exposure to the hazard by the employees *of the employer* who is responsible of the hazard. The Second Circuit refused to read the statute narrowly on this question.

> This specific duty to comply with the Secretary's standards is in no way limited to situations where a violation of a standard is linked to exposure of his employees to the hazard.... In a situation where, as here, an employer is in control of an area, and responsible for its maintenance, we hold that to prove a violation of OSHA the Secretary of Labor need only show that a hazard has been committed and that the area of the hazard was accessible to the employees of the cited employer or those of other employers engaged in a common undertaking.

513 F.2d at 1038. The Second Circuit held that this approach also furthers the preventive and remedial objectives of the Occupational Safety and Health Act. The Commission has followed this rule since it was promulgated in 1975. *See, e.g., Anning–*

---

**4.** This section states: "Cabinets, cutout boxes, fittings, boxes, and panelboard enclosures in damp or wet locations shall be installed so as to prevent moisture or water from entering and accumulating within the enclosures. In wet locations the enclosures shall be waterproof."

*Johnson Co.*, OSHRC Docket Nos. 3694 & 4409 (May 12, 1976).

■ We also reject A/C's contention that this rule imposes a strict liability standard on small businesses. Employers may still raise the defense of impossibility, which is described in *Brock v. Dun–Par Engineered Form Co.*, 843 F.2d 1135, 1136 (8th Cir.1988):

> Under this defense, [the employer] was required to demonstrate (a) that compliance with the ... standard's literal requirements was not possible or would preclude performance of [its] work, and (b) that [the employer] used alternative means of protection not specified in the standard, or that alternative means of protection were unavailable.

Impossibility is an affirmative defense that an employer must invoke in its answer to the Secretary's complaint. 29 C.F.R. § 2200.36(b). A/C failed to raise this defense below and thus has waived it. *See Dole v. Williams Enter., Inc.*, 876 F.2d 186, 189 (D.C.Cir.1989) (employer who failed to plead affirmative defense of "greater hazard" waived it). We also note that even if small contractors are held responsible for violations caused by others, they can protect themselves by negotiating reimbursement agreements with general contractors.

### III

■ The final two violations attributed to A/C concern an incident involving Jim Hammock, one of its employees. Mr. Boylan saw Mr. Hammock at work on an overhead ceiling fixture while standing on a tubular welded mobile scaffold in the complex's racquetball court. The scaffold was ten feet high, but Mr. Hammock's only support was a single plank only 9⅜″ wide. Mr. Boylan ordered Mr. Hammock off of the scaffold, which Mr. Boylan considered extremely hazardous. Mr. Hammock left the platform by climbing down the end frames, which were not properly lined up to provide a ladder. Mr. Boylan subsequently cited A/C for violations of 29 C.F.R. § 1926.451(e)(4),[5] which requires platforms to be tightly planked, and 29 C.F.R. § 1926.451(e)(5),[6] which requires platforms to contain access ladders. A/C protests, as it did below, that it had nothing to do with Mr. Hammock's actions. The racquetball court comprised the only electrical work on the site that required A/C's employees to work above ground. Mr. Treece, A/C's supervisor on the scene, intended to do this wiring himself, using a rented stepladder. He evidently never discussed this particular part of the job with either of his employees. In fact, A/C did not even bring any of its scaffolding equipment to the site.

A/C contends, therefore, "that it should not be held accountable for work and safety practices imposed on its employees without its knowledge or consent, in direct contradiction to the safe and proper work/safety practices planned and already partially implemented by A/C." Petitioner's Brief at 9. In support of this position, A/C cites *Progressive Drywall Co.*, OSHRC Docket No. 83–179 (Oct. 14, 1983), in which an employer was cited because its employee was working on another employer's unsafe ladder. The Commission vacated the citation on the grounds that "there is no evidence that the employer had any knowledge that the defective ladder was in its work area or was being used even briefly by its employee." A/C claims that in this case, not only was it cited for employee actions it could not control, but it has been cited for not telling its employees to ignore the orders of the general contractor.

The ALJ rejected this argument. He concluded that *Progressive Drywall Co.* did not apply to this case, because unlike the employer in that case, "A/C could have

---

**5.** This section states: "Platforms shall be tightly planked for the full width of the scaffold except for necessary entrance opening. Platforms shall be secured in place."

**6.** This section states: "A ladder or stairway shall be provided for proper access and exit and shall be affixed or built into the scaffold and so located so that when in use it will not have a tendency to tip the scaffold. A landing platform must be provided at intervals not to exceed 35 feet."

known with the exercise of reasonable diligence that its employee would use the faulty scaffold." He found that Mr. Hammock and Mr. Seiler "felt no compunction about using scaffolds owned and erected by other contractors," and concluded:

> When it is a common practice for employees to use the equipment of other contractors and no specific work rules have been issued to employees to prevent such practice, a contractor may not escape his responsibility by claiming to be surprised when its employee uses the existing scaffold.

A/C now argues that since only a tiny percentage of the wiring at the jobsite required any above-ground work, it could never have foreseen that one of its employees would borrow and use *scaffolding* equipment. Finally, A/C claims that the Secretary's position is inconsistent. On the electrical violations, it was punished because instruments it controlled were unsafe even though its own employees were not endangered. On the scaffolding violations, it was punished because its employee was involved, even though the hazard was created by someone else.

Once again, established precedent supports the Secretary. A/C did not provide proper instructions to its employees regarding scaffold safety. A/C's claim that it could not have foreseen the hazard is thus precluded by *Brock v. L.E. Myers Co.*, 818 F.2d 1270, 1277 (6th Cir.1987), in which we concluded that "the Secretary makes out a *prima facie* case of the employer's awareness of a potentially preventable hazard upon the introduction of proof of the employer's failure to provide adequate safety equipment or to properly instruct its employees on necessary safety precautions." We explained our reasoning for this holding as follows:

> The statutory duty to assure compliance with standards issued under the Act includes the obligation to prevent hazardous noncomplying conduct by employees. "[A]n instance of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct ... *at the moment of its occurrence.* Conceivably, such conduct

might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees."

*Ibid.* (quoting *National Realty and Constr. Co. v. Occupational Safety and Health Comm'n*, 489 F.2d 1257, 1267 n. 37 (D.C.Cir.1973)) (emphasis added). A/C cannot "fail to properly train and supervise its employees and then hide behind its lack of knowledge concerning their dangerous working practices." *Danco Constr. Co. v. Occupational Safety and Health Comm'n*, 586 F.2d 1243, 1246 (8th Cir. 1978). Finally, we reject A/C's argument that the contractor responsible for the scaffolding should have been cited instead of A/C. We adopt the reasoning of *Central of Ga. R.R. v. Occupational Safety and Health Comm'n*, 576 F.2d 620 (5th Cir. 1978), which rejected a similar complaint.

> Central argues that since Continental Can was the logical party to charge with the violation, Continental alone should have been cited. This amounts to an argument that only one violator may be cited for any OSHA violation.... [E]ven if Continental might have been cited, this would not necessarily have relieved Central of its duties.

576 F.2d at 625 (footnote omitted).

### IV

After a careful review of the record, we are satisfied that substantial evidence supports the Secretary's findings. We also believe that the ALJ below applied the proper legal standard to the facts. Therefore, the judgment of the Commission is AFFIRMED.