*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0057P (6th Cir.)
File Name: 03a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DANIS-SHOOK JOINT
VENTURE XXV,
                              *Petitioner,*

                                                    No. 01-4038

          *v.*

SECRETARY OF LABOR,
                              *Respondent.*

---

On Appeal from a Decision and Order of
the Occupational Safety and Health Review Commission.
No. 98-1192.

Argued: January 30, 2003

Decided and Filed: February 20, 2003

Before: MARTIN, Chief Circuit Judge; MERRITT and
LAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gary W. Auman, DUNLEVEY, MAHAN &
FURRY, Dayton, Ohio, for Petitioner. Ronald J. Gottlieb,

---

*The Honorable Donald P. Lay, Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Respondent. **ON BRIEF:** Gary W. Auman, DUNLEVEY, MAHAN & FURRY, Dayton, Ohio, for Petitioner. Ronald J. Gottlieb, Ann Rosenthal, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Respondent.

—————————

**OPINION**

—————————

BOYCE F. MARTIN, JR., Chief Circuit Judge.  This case arises from an appeal of a decision by the Occupational Safety and Health Review Commission regarding a drowning accident at a work site in Beavercreek, Ohio.  That decision reversed in part and affirmed in part the decision of the administrative law judge in this matter.  Danis-Shook, the petitioner, claims that the judgment of the Review Commission was arbitrary, capricious and an abuse of discretion.  The Review Commission found that Danis-Shook had violated two sections of the Occupational Safety and Health Act.  First, the Commission found that Danis-Shook violated 29 C.F.R. § 1926.21(b)(2) in failing to instruct employees in the recognition and avoidance of the hazards associated with entering a basin filled with accumulated water.  Second, the Commission found that Danis-Shook had knowledge of the failure of its employee to use personal protective equipment in violation of 29 C.F.R. § 1926.95(a), and Danis-Shook's unpreventable supervisory misconduct defense failed.  In essence, the Review Commission found that Danis-Shook made some efforts to insure safety but that its enforcement of safety rules was not sufficiently aggressive and its safety instructions not clear and definite.

In April of 1996, Danis Industries and Shook, Inc., entered into a joint venture for the expansion of the Beavercreek wastewater treatment plant in Ohio.  As part of the expansion

asserts that Danis-Shook did not enforce its policy as written. The written safety policy required hazards not covered to be reported so that changes could be made in the program. The Danis-Shook supervisor, who oversaw the foremen, did not require the foremen to report a hazard if they thought they could address it effectively themselves.  Finally, there was no work rule that specifically required Wagner to wear personal protective equipment when entering accumulated water in the basins.  While Danis-Shook need not have a rule so specific, it could and should have required that its employees wear lifelines, harnesses and vests whenever there was a danger of engulfment.  The Danis-Shook rule on personal protective equipment was discretionary and not mandatory, and this was insufficient.

For the foregoing reasons, the final order of the Occupational Safety and Health Review Commission is affirmed upon the reasoning employed by the Commission in its decision dated August 2, 2001.

*Id.* at 1277. Because Wagner was a foreman and knew of his own failure to wear personal protective equipment, this failure may be imputed to Danis-Shook. *Donovan v. Capital City Excavating Co., Inc.*, 712 F.2d 1008, 1010 (6th Cir. 1983). Additionally, two other foreman knew of Wagner's intention to work in Basin 1 and to investigate why the water was not draining.

Further, as the Secretary continues to argue, Danis-Shook knew of the hazard. Its supervisors testified that they considered it a hazard for any person to enter the accumulated water in the basins without full personal protective equipment. They were aware of these conditions, yet they did not require personal protective equipment in a situation like Wagner's. Their rule merely required personal protective equipment "as needed." This kind of rule relies on the judgment of supervisors, and as evidenced by the tragic result in this case, that was not enough.

Finally, Danis-Shook asserts that it is entitled to an affirmative defense of unpreventable employee misconduct. In the Sixth Circuit, in order to successfully assert this defense, an employer must show that it has a thorough safety program, it has communicated and fully enforced the program, the conduct of the employee was unforeseeable, and the safety program was effective in theory and practice. *See CMC,* 221 F.3d at 866. Danis-Shook asserts it has met all these criteria.

The Secretary points out that to be effective, the safety program must be designed such that, if followed, it would prevent the violations at issue. *See National Engineering & Contracting Co. v. U.S., Occupational Safety and Health Review Comm'n*, 838 F.2d 815, 819 (6th Cir. 1987) (affirming rejection of unpreventable employee misconduct defense based on absence of work rule designed to prevent violation). The Secretary claims Danis-Shook did not have an effective safety policy because its program did not address the engulfment hazard at issue in this case. The Secretary also

work, Danis-Shook constructed two identical equalization basins to provide added capacity for storage of sewage following storm surges. The basins are above ground and round, uncovered, concrete basins. They have a diameter of approximately two hundred feet, and they are about twenty feet high. The floors of the basins slope toward the center at about one half inch per foot. At the center of the basins is a drain pipe, forty-two inches in diameter. The pipe drops straight down six feet before reaching an elbow joint, where it thereafter proceeds horizontally, underground, to the pump station.

During the construction of the basins, Danis-Shook covered the drain pipes with plywood covers less than one inch-thick. Wooden boards were secured underneath each of the two plugs. Danis-Shook installed the plugs to prevent falling injuries while the basins were still under construction. The basins were completed in the fall of 1997, but the pump station was not yet completed. To prevent water from draining from the basins to the station, Danis-Shook left the plugs in place through the winter. The company also caulked around the plugs to prevent leakage.

When the pump station was finished in April of 1998, the basins still needed more work, including placing brackets on the walls for supporting aeration pipes. Rainwater and snowmelt from the winter had accumulated in the basins however, to between twelve and thirty inches deep, and the basins needed to be drained. To drain them, a laborer wearing waders, life vest, harness and lifeline entered the water and drilled three holes in each plywood plug. The water began to drain, but the basins did not empty completely.

About two weeks after Danis-Shook drilled the holes, the pipefitters on the project finished their work on the pump station and began working in Basin 2. The pipefitters' foreman was James Wagner, Sr., and he had a crew of two men, one of whom was his son. There were still several inches of water in the bottom of Basin 2, so the crew did as

much work around the dry upper edges of the sloped floor as possible. The work did not involve going in the water at all. Because they could go no further in Basin 2 until the remainder of the water was gone, Foreman Wagner made a decision to begin working on Basin 1 on April 22, 1998. While the two crew members worked on assembling tools and cleaning the wall castings, Foreman Wagner, wearing waders, walked into the accumulated water in Basin 1. The water was more than thirty-two inches deep at the drain. The foreman wanted to see why the pipe was not draining. His crew watched him pull a piece of plastic sheeting away from the plug. Next, Foreman Wagner used a long metal piece of equipment to slide over the plug, "thumping" the bar on the plug. The plug dislodged, and Foreman Wagner was sucked down the drain and drowned.

Within an hour and a half of the accident, an Occupational Safety and Health Administration safety specialist was at the construction site to make observations and conduct interviews. On the basis of the information she gathered, the Secretary of Labor issued a "serious citation" to Danis-Shook. She alleged "serious violations:" of 1) Section 5(a)(1) of the Occupational Safety and Health Act for failing to provide a workplace free of recognized hazards by exposing employees who entered the accumulated water in the basin to a potential engulfment hazard; 2) 29 C.F.R. §1926.21(b)(2) for failing to instruct employees in the recognition and avoidance of hazards associated with entering a basin filled with accumulated water; and 3) 29 C.F.R. §1926.95(a) for failing to require employees entering the water in the basin to wear appropriate personal protective equipment such as safety harnesses and lifelines. The administrative law judge vacated the first citation, and that holding was not appealed. The judge also vacated the citation for failing to instruct in violation of Section 1926.21(b)(2). The judge found the citation was appropriate for Section 1926.95(a), and he rejected Danis-Shook's affirmative defense that Foreman Wagner engaged in unpreventable supervisory misconduct. The Review Commission found violations for both sections.

The question for review is whether Danis-Shook had knowledge of the violation. We have held, in *A/C Elec. Co. v. Occupational Safety and Health Review Comm'n*, 956 F.2d 530, 535 (6th Cir. 1991) (citing *L.E. Myers*), that "the Secretary makes out a prima facie case of the employer's awareness of a potentially preventable hazard upon the introduction of proof of the employer's failure to provide adequate safety equipment or to properly instruct its employees on necessary safety precautions."

In this court, an employer "cannot fail to properly train and supervise its employees and then hide behind its lack of knowledge concerning their dangerous working practices." *A/C Elec.,* 956 F.2d at 535 (internal citations omitted). Danis-Shook argues, however, that it lacked knowledge of Wagner's exposure to the hazard created by his failure to wear personal protective equipment, and it could not possibly have prevented it, echoing many of its arguments from the first part of the case. Danis-Shook again relies on the three conversations Wagner had with different supervisors, arguing that Wagner should have known from those conversations that the equipment was required. As noted above, however, those conversations were not directives, and they pertained only to drilling in the plug.

Danis-Shook also notes that Wagner twice passed up the opportunity to use the equipment in the minutes before the accident: once as he went to get the waders and then again in his own toolbox. Wagner communicated the safety policy to his own employees. Wagner abandoned unfinished work in Basin 2 to go to Basin 1, and the other supervisors on site could not see into the basins.

The Review Commission found that the Secretary made out a prima facie showing of knowledge because Danis-Shook either knew or with reasonable diligence could have known of the presence of the hazardous condition. 29 U.S.C. § 666(k); *see also L.E. Myers*, 818 F.2d at 1272. Further, the knowledge of a supervisor may be imputed to the employer.

(6th Cir. 2000). Additionally, this court has found that "In cases involving negligent behavior by a supervisor or foreman which results in dangerous risks to employees under his or her supervision, such fact raises an inference of lax enforcement and/or communication of the employer's safety policy." *L.E. Myers*, 818 F.2d at 1277.

Danis-Shook also argues that Foreman Wagner was a pipefitter, and pipefitters are not supposed to do any work of laborers at Danis-Shook. As a pipefitter, Foreman Wagner should never have gone near the water in Basin 1, and Danis-Shook could not anticipate that he would. Danis-Shook, however, imbues its supervisors with a great deal of discretion, and Wagner had the discretion to move his crew from Basin 2 to Basin 1. He was authorized to work in areas that had not been designated ready for work, so long as he determined that the area was not hazardous. Foreman Wagner did not perceive the work in Basin 1 as hazardous. Further, Wagner's son testified that the different tradesmen on site did not necessarily perform exclusively their specific jobs.

The second issue is whether Danis-Shook violated 29 C.F.R. § 1926.95(a) by failing to require its employees entering the water in the basins to wear appropriate personal protective equipment such as safety harnesses, lifelines, or buoyant vests. Section 1926.95(a) requires

Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.

The Supreme Court has defined the duties of the Review Commission, saying, "The Commission is assigned to 'carr[y] out adjudicatory functions' under the Act." *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 147 (1991) (internal citations omitted). The Court went on to say, "Initial decisions are made by an administrative law judge, whose ruling becomes the order of the Commission unless the Commission grants discretionary review." *Id.* at 148 (internal citations omitted). "[W]hen the Commission reverses the factual findings of the ALJ, who had the unique opportunity of observing the demeanor of the witnesses and accepting or rejecting their testimony based on those observations, the Commission must articulate reasons for its failure to credit those findings." *Brock v. L.E. Myers Co., High Voltage Div.*, 818 F.2d 1270, 1277 (6th Cir.), *cert. denied*, 484 U.S. 989 (1987).

The Review Commission's duties are not identical to ours in reviewing its decision. "Our review of the facts, as found by the agency or the official charged with agency operations, is whether or not there is substantial evidence in the record as a whole to support the facts as found." *Nelson Tree Services, Inc. v. Occupational Safety and Health Review Comm'n*, 60 F.3d 1207, 1209 (6th Cir. 1995). "The Commission's conclusions of law are viewed favorably unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (internal citations omitted). *See also Trinity Indus., Inc., v. Occupational Safety and Health Review Comm'n*, 16 F.3d 1455, 1459 (6th Cir. 1994). This is a highly deferential standard. *See J.L. Foti Const. Co. v. Occupational Safety and Health Review Comm'n*, 687 F.2d 853, 855 (6th Cir. 1982) ("If there is warrant in the record for the result below, that result must stand, even if we might have interpreted the evidence differently in a trial de novo.").

The first issue is whether the Review Commission abused its discretion when it found that Danis-Shook violated Section 1926.21(b)(2), by failing to instruct employees who entered the basins in the recognition and avoidance of hazards

associated with engulfment or being sucked into the pipe as the water was drained from it. The administrative law judge vacated the violation, because he found that although Foreman Wagner may not have appreciated the danger in working around the plug, Danis-Shook satisfied its obligations by generally pointing out an engulfment hazard and by providing a general rule for the use of personal protective equipment.

The materials provided to Danis-Shook employees do not satisfy the regulation, the Secretary argues, as none of them addressed the use of safety equipment while in a situation like the one at issue, nor did they fully address working in water. Those in charge at Danis-Shook certainly understood the danger, at minimum, because the standing water had been in the basins all winter. The orientation and other safety materials should have specifically addressed the dangers presented by the basins and the plugs at their drain pipes.

Danis-Shook argues that it did fulfill its obligations in warning its employees of the engulfment danger and need for personal protective equipment. Danis-Shook had a comprehensive safety program including a written safety program, a site-specific safety program, an employee safety guide, written programs dealing specifically with personal protective equipment, weekly "toolbox talks" on safety, and one-on-one instruction. The written safety program, in relevant part, required that personal protective equipment be used as needed, and it required employees to wear a buoyant life vest when working near water of a depth that created a risk of drowning. The Superintendent walked the work site every day, watching for safety violations.

Danis-Shook further argues that Foreman Wagner was instructed three times in the weeks prior to the accident about the necessity of wearing harnesses and lifelines when working near the basin plugs. A supervisor told Wagner a few weeks before that the laborers who had drilled the holes in the plugs had worn lifelines, vests and safety harnesses. The same

supervisor, two days before the accident, again told Wagner about the equipment used. Finally, on the morning of the accident, when Foreman Wagner went to get the waders, another supervisor told him that when the laborers had drilled the holes, they had worn vests, lines and harnesses.

The Secretary argues that the three conversations with Foreman Wagner were not enough to satisfy the regulation. Informal comments do not constitute instruction. As the Review Commission said, "An employer [must] *instruct* its employees in the recognition and avoidance of hazards that are specific to the work site about which a reasonably prudent employer would have been aware" (emphasis added). In none of these conversations was the supervisor explicit that Wagner needed to wear lines, a vest, and a harness. The conversations all involved a report that the laborers *drilling* in the plywood wore the equipment; none specifically pertained to checking the plug. The supervisors never told Wagner he was required to wear the equipment, nor did they adequately convey the danger the plugs presented. One of Wagner's crew gave evidence that a few weeks before the accident, Wagner had told him that he needed to wear the protective equipment if he was going to work on the plug. This crewman also testified, however, that he did not remind Wagner of the conversation when Wagner waded into the water because "It didn't seem unsafe to do it."

Further, as even the administrative law judge pointed out, Foreman Wagner was a supervisor, and his failure to use safety equipment while at the plug "indicates his lack of understanding or appreciation of the hazard." Foreman Wagner and his crew, all of whom had been foremen themselves, could not appreciate the danger of Foreman Wagner's actions, and they had not been appropriately warned of the danger. This is the precise situation that the regulations seek to avoid. Employers cannot count on employees' common sense and experience to preclude the need for instructions. *See CMC Elec., Inc. v. Occupational Safety and Health Admin., U.S. Dep't. of Labor*, 221 F.3d 861, 865-66