RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MOUNTAIN STATES CONTRACTORS, LLC,

*Petitioner,*

*v.*

No. 15-3782

THOMAS PEREZ, Secretary of Labor,

*Respondent.*

─────────────────

On Petition for Review of a Final Order of the
Occupational Safety and Health Review Commission.
No. 13-2043.

Argued: March 9, 2016

Decided and Filed: June 3, 2016

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Howard M. Kastrinsky, KING & BALLOW, Nashville, Tennessee, for Petitioner. Juan C. Lopez, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent. **ON BRIEF:** Howard M. Kastrinsky, Michael D. Oesterle, Laura M. Mallory, KING & BALLOW, Nashville, Tennessee, for Petitioner. Juan C. Lopez, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent.

─────────────────

## OPINION

─────────────────

JANE B. STRANCH, Circuit Judge. During construction of a bridge over the Cumberland River, a crane's boom cable snapped and the crane collapsed, shattering the glass enclosing the operator's compartment and damaging a vehicle on the adjacent highway.

1

Mountain States Contractors, LLC challenges the affirmance of a citation and penalty issued against it by the Occupational Safety and Health Commission (OSHC) following the incident. At a trial on the merits, the Administrative Law Judge determined that Mountain States had committed a willful violation of the wire rope inspection standard set forth in the Occupational Safety and Health Administration Act of 1970 (the Act). The ALJ found a violation of the Act because, prior to the accident, the crane's boom cable had "visible broken wires" within the meaning of the provision requiring repair or replacement before further use, and that Mountain States had knowledge of this deficiency. For the following reasons, we deny the petition for review.

## I. BACKGROUND

The Tennessee Department of Transportation engaged Mountain States, a construction contractor based in Nashville, Tennessee, to build two bridges over the Cumberland River at its intersection with Highway 109 in Gallatin, Tennessee. (Appendix at 9.)[1]

On May 21, 2013, the boom cable of a Terex HC 165 crane snapped while the crane operator was "clamming," or excavating material from under water, causing the boom—the extendable overhead arm of the crane controlled by the load-bearing wire boom cable—to collapse onto the adjacent highway. (*Id*. at 10-11, 13.) As the cable broke under tension, it whipped back to shatter the windows of the crane operator's cab, (*Id.* at 29-30), and the boom hit a passing vehicle, (Supp. Appendix at 1177.) Though no person was injured, the subsequent Occupational Safety and Health Administration (OSHA) investigation determined that at least four people were exposed to risk as a result of the accident. (Appendix at 156.) After completion of the investigation, a complaint was filed against Mountain States alleging, among other things, violation of the wire rope inspection standard, 29 C.F.R. § 1926.1413(a)(2)(ii)(A). (*Id*. at 90.)

---

[1]Citations to the Appendix refer to the page numbers listed in parentheses on the top right corner of the page. This pagination is continued in the Supplemental Appendix in the bottom right corner of the page.

## A. Wire Rope Inspection Standard and Worksite Safety Policies

The Act requires that employers "comply with occupational safety and health standards promulgated under this chapter." 29 U.S.C. § 654(a)(2). Subpart CC of the Act pertains to the use of cranes in construction, including the inspection standard for "wire rope" like the boom cable at issue. 29 C.F.R. § 1926.1401 *et seq*. The standard requires that a "competent person" perform "a visual inspection prior to each shift the [crane] is used" that includes "observation of wire ropes … that are likely to be in use during the shift for apparent deficiencies." 29 C.F.R. § 1926.1413(a)(1). A "competent person" is "one who is capable of identifying existing and predictable hazards in the surroundings or working conditions which are … hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them." 29 C.F.R. § 1926.1401.

The boom cable, which runs through steel sheaves to adjust the height of the boom, is composed of multiple steel wires wound into strands and wrapped around a core. *Id*. According to Category II of the wire rope inspection standard, the crane must be taken out of service for repair if a cable has "visible broken wires" defined as either (1) "[s]ix randomly distributed broken wires in one rope lay," or (2) "three broken wires in one strand in a rope lay." 29 C.F.R. §§ 1926.1413(a)(2)(ii)(A)(1), (a)(4). These conditions are referred to as the "out-of-service criteria" or the "3 and 6 criteria." (Appendix at 21, 28.) A "rope lay" is "the length along the rope in which one strand makes a complete revolution around the rope." 29 C.F.R. § 1926.1413(a)(2)(ii)(A)(1).

Mountain States considered its crane operators "competent persons" within the meaning of the Act and delegated the task of pre-shift inspections of the crane to them. (Petitioner Br. at 10.) The crane operators were empowered to remove a crane from service pursuant to the requirements of the Act and in conformity with Mountain States' policy that "equipment found to have defects in any critical area which could affect the safe operation of the equipment shall be tagged accordingly and taken out of service until proper repairs have been made." (Appendix at 222.)

The crane operators documented the results of their inspections on a Daily Inspection Form. The Form contained a checklist for components of the crane separated into two sections based on whether the component could be inspected in a "walk around inspection" or required the operator to "climb up onto machine." (*Id*. at 171-99). As the operator inspected each component on the list, he checked one of three options defined in the Form's "explanation of terms" section: (1) "satisfactory" if the item was "in good working condition," (2) "adjust" if the "item needs minor adjustment at first opportunity," and (3) "repair" if the item "needs to be repaired *before further operation*." (*Id*.) (emphasis added). The Form also included a "remarks or comments" section for notes on components that needed to be replaced, specific care instructions and the like (e.g., "2nd line needs to be replaced. Crane fully greased.") (*Id*. at 171.) An instruction to "submit yellow copy [of Daily Inspection Form] to project office at end of each week" appeared at the bottom of the Form. (*Id*. at 171-99.) In practice, however, the Forms were maintained in the inspection book in the crane's cab until full and then they were shipped to a storage facility without any review. (*Id*. at 19-20, 28, 164.)

Beyond these measures pertaining specifically to the crane, other safety practices instituted by Mountain States included daily "pre-work huddles" during which supervisors reviewed the day's tasks and related safety issues, (*id*. at 572), and weekly safety training sessions, (*id*. at 54, 412.) Weekly in-house site safety audits were supplemented by regular safety audits conducted by a third party. (*Id*. at 728.)

## B. The OSHA Inspection and Trial

The accident was reported to OSHA, which launched an investigation of the worksite led by Compliance Safety and Health Officer Michelle Sotak. (*Id*. at 47; Supp. Appendix at 1145.) At the conclusion of the investigation, Mountain States was issued three Citations and Notice of Penalty—the first citation alleged a serious violation of the Act, the second a willful violation, and the third an "other-than-serious" violation that carried no financial penalty. (Appendix at 94-96.) A complaint was filed with the OSHC seeking affirmance of the three citations. (*Id*. at 90.) Mountain States timely filed a Notice of Contest regarding the first two citations and their

associated monetary penalties.[2]  (*Id*. at 122-23.)  Prior to the trial on September 16 to 18, 2014, the parties reached a settlement with respect to the first citation.  (*Id*. at 123.)  Thus, the only issue considered by the ALJ was the second citation alleging a willful violation: "Hwy 109 @ Cumberland River – On or about 5/21/13, damaged cables were not removed from service." (*Id*. at 95.)  *See* 29 C.F.R. § 1926.1413(a)(4)(ii)(B) (stating that, in the presence of a Category II deficiency, "operations involving use of the wire rope in question must be prohibited until . . . [t]he wire rope is replaced.").

After the three-day trial on the merits, the ALJ found that the Secretary of Labor had satisfied the burden to show the alleged violation by a preponderance of the evidence.  The ALJ affirmed the second citation and assessed a penalty of $60,000.00 on Mountain States. (Appendix at 169-70.)  On appeal, Mountain States asserts that the record does not support a finding that the Secretary met the second and fourth conditions to show a prima facie violation of the Act.  (Petitioner Br. at 17.)  Moreover, Mountain States contends that the ALJ erroneously included "cracked" or "fractured" wires within the definition of a Category II deficiency and also misinterpreted the meaning of "competent person" as used in the wire rope inspection standard. (*Id*. at 13-14.)

## II.  STANDARD OF REVIEW

This court's review of decisions reached by the OSHC is a limited one.  The ALJ's determination will be set aside if it is "arbitrary, capricious, an abuse of discretion, or contrary to law."  *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 818 (6th Cir. 1998).  We accept the ALJ's findings of fact if they are "supported by substantial evidence on the record considered as a whole."  *Id*.; *see also Danis-Shook Joint Venture XXV v. Sec'y of Labor*, 319 F.3d 805, 809 (6th Cir. 2003).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Chao v. Occupational Safety and Health Review Comm'n*, 540 F.3d 519, 528 (6th Cir. 2008) (internal citation omitted).  It is less than a preponderance of the evidence, but "more than a scintilla." *R.P. Carbone Constr. Co.*, 166 F.3d at 818.

---

[2]Mountain States did not admit the violation set forth in the third citation, but chose not to contest it because it was issued without a proposed monetary penalty.  (Petitioner Br. at 3.)

To establish a prima facie violation of the Act, the Secretary of Labor must show by a preponderance of the evidence that "(1) the cited standard applies to the facts, (2) the requirements of the standard were not met, (3) employees had access to the hazardous condition, and (4) the employer knew or could have known of the hazardous condition with the exercise of reasonable diligence." *Carlisle Equip. Co. v. Sec'y of Labor & Occupational Safety*, 24 F.3d 790, 792-93 (6th Cir. 1994) (internal citation omitted).

## III. LEGAL ANALYSIS

Mountain States admits that the Secretary of Labor has satisfied the first and third conditions to establish a prima facie violation of the Act. (Petitioner Br. at 17.) First, the cited standard, 29 C.F.R. § 1926.1413(a)(4)(ii)(B), "applies to cranes used in construction." (Appendix at 141.) The third condition is also met, as "at least four people were exposed to the falling boom and cable." (*Id*. at 156.) Thus, the substance of the ALJ's examination focused on the second and fourth conditions—the requirements of the standard and the knowledge of Mountain States.

### A. Condition Two: Requirements of the Wire Rope Inspection Standard

The ALJ found that "the great weight of the evidence" supported the Secretary of Labor's allegation "that the terms of the cited standard were violated." (*Id*. at 152.) In reaching this conclusion, the ALJ looked to the Daily Inspection Forms, evidence produced during Officer Sotak's investigation, and witness testimony presented at trial.

#### 1. Condition of the Crane Components

Mountain States' Daily Inspection Forms reveal that components of the crane, including the boom cable and the auxiliary cable,[3] were in need of replacement as early as three months before the accident. Unlike the boom cable, the auxiliary cable was eventually replaced approximately one month before the accident. Originally, the Secretary of Labor sought to pursue violations relating to both cables. (*Id*. at 130.) However, the ALJ found that any alleged violation based on the condition of the auxiliary cable was time-barred because the citation was

---

[3]The auxiliary cable opens and closes the crane's bucket.

issued more than six months after it was replaced. *See* 29 U.S.C. § 658(c) ("No citation may be issued under this section after the expiration of six months following the occurrence of any violation."). While the crane operators' observations regarding both cables are recounted for a complete explanation of the Forms, only the condition of the boom cable is considered on appeal.

As early as February 19, 2013, crane operator Aaron Hutchins noted in his Daily Inspection Form that the auxiliary cable needed to be replaced. (Appendix at 127, 171.) He also checked the "repair" box for the auxiliary winch, indicating that it should be "repaired before further operation." (*Id*.) However, neither component was replaced despite continued use of the crane. Hutchins conducted daily inspections on February 25 and 26, and March 27, making the same observation regarding the auxiliary cable in his Daily Inspection Form. (*Id*. at 173-75.) His growing agitation concerning the cable's condition is apparent in the increasing number of exclamation points punctuating the repeated "aux cable needs to be replaced" notation—three exclamation points on April 2 and fourteen on April 9. (*Id*. at 177, 179.) Site foreman and crane operator Shawn Shehane made the same notation (absent the exclamation points) in his nine inspections throughout the month.[4] (*Id*. at 176, 180-85, 187-88.) The Daily Inspection Forms for that period also bore a check in the "repair" box for the cable spool. (*Id*.) A new auxiliary cable was finally ordered on April 26 and installed on the same day. It is not clear from the record if or when the auxiliary winch and cable spool were repaired.

It was first noted in the comments section of an unsigned Daily Inspection Form for April 13, more than a month prior to the accident, that the boom cable needed to be replaced. (*Id*. at 182.) Two days later, this comment was repeated in a Daily Inspection Form completed by Shawn Shehane. (*Id*. at 183.) The poor condition of the boom cable appears to have attracted attention even earlier, as an Inspection Form from the preceding week mentioned that a new boom cable had been ordered. (*Id*. at 181.) Throughout the rest of April, the Daily Inspection Forms completed by Shehane and Hutchins noted either that the boom cable was in need of replacement or that a new one had been ordered. Hutchins also marked the "repair" box for the

---

[4]Shawn Shehane is the nephew of Tommy Shehane, site superintendent for the project. (Appendix at 16.) To avoid confusion, both are referred to by their first or full names.

boom cable, indicating it should be "repaired before further operation."[5] (*Id*. at 186, 189.) There is no record of the replacement boom cable's arrival.

A third Mountain States employee, Alton Brian Bundy, operated the crane during most of the month of May. (*Id*. at 190-97.) Unlike his colleagues, he marked all components of the crane as "satisfactory" without further comment until the day before the accident. (*Id*.) On May 20, he noted for the first time that the crane needed a new boom cable, though he continued to mark all components as "satisfactory." (*Id*. at 198.) Bundy repeated this comment on the Daily Inspection Form for May 21, the day that the cable snapped. (*Id*. at 199.) According to witness testimony presented at trial, there was a replacement boom cable at the worksite waiting to be installed on the day that the crane collapsed. (*Id*. at 128.)

Despite the repeated notations in the Daily Inspection Forms regarding the poor condition of the boom cable, the annual inspection of the crane conducted by equipment manager Robert Kindrat in early April made no mention of it. (*Id*. at 43-45; Supp. Appendix at 1172-74.) Kindrat testified that, although he had observed two broken wires in two different lays of the boom cable, it did not meet the out-of-service criteria at the time of his inspection. (Appendix at 45.) However, he reached this conclusion without "booming down" the crane to unspool a larger section of cable for inspection. (*Id*. at 44.) Notably, booming down is a required component of an annual inspection when "the results of the visual inspection … indicate that further investigation necessitating taking apart equipment components or booming down is needed." 29 C.F.R. §§ 1926.1412(d)(1), (f)(1). The only mention of either cable on the Annual Inspection Form is a brief note that "aux cable is bad" and "new cable is ordered!" (Supp. Appendix at 1173.)

Kindrat's conclusions, insofar as they differed from the Daily Inspection Forms, were soon further called into question by a follow-up inspection of the crane conducted by Mechanic Darryl Meredith and Hutchins. (Appendix at 36.) In a statement signed the day after the accident, Hutchins claimed that he and Meredith discovered additional broken wires in the boom cable shortly after the annual inspection and took this information to foreman Shawn Shehane,

---

[5]The boom cable is referred to in the Daily Inspection Form checklist as "boom hoist and reeving." (Appendix at 38.)

warning that the boom cable was "bad," had broken wires throughout, met the out-of-service criteria, and needed to be replaced. (Supp. Appendix at 1168.) However, while a replacement boom cable was eventually ordered, operations involving the crane did not cease until its collapse. (*Id.*)

### 2. Testimony at Trial

At trial, Officer Sotak testified regarding her interviews in May and July with the three crane operators. *See R.P. Carbone Const. Co.*, 166 F.3d at 819 (explaining that "relevant and material hearsay may constitute substantial evidence") (citing *Bobo v. United States Dept. of Agriculture*, 52 F.3d 1406, 1414 (6th Cir. 1995)). She testified to interviewing Hutchins the day after the accident, (Supp. Appendix at 1146), at which time, he stated specifically that "he had observed six randomly broken wires in a lay and three broken wires in a strand" of the boom cable before the accident. (*Id.* at 1147.) She further testified that Hutchins had informed Shawn Shehane of the "bad" cable and that "they needed a new one." (*Id.*) These statements were recorded and signed by Hutchins. (*Id.* at 1168). Officer Sotak spoke to Bundy the same day, but at that time, he claimed not to know what had caused the cable to break. (*Id.* at 1149.) When she interviewed the two together in a follow-up meeting in July, Officer Sotak testified, both Hutchins and Bundy stated that, "the crane should have been brought down" prior to the accident because "they had observed broken wires and smashed wires." (*Id.* at 1150.)

Officer Sotak also interviewed Shawn Shehane on the day after the accident. She testified to this conversation, in which Shawn told her that Hutchins had warned him of his concerns and that Shawn had observed "broken wires" in the boom cable, but not enough to satisfy the out-of-service criteria. (*Id.* at 1150-51.) Shawn's interview was also recorded in a signed statement. (*Id.* at 1179.)

At trial, Hutchins departed from his signed statement and his interview (as testified to by Officer Sotak) by refusing to use the adjective "broken" in his testimony. Contradicting his prior statement, Hutchins denied that there were "six broken wires in any of the lay of the boom cable" prior to the accident. (Appendix at 39.) He did, however, confirm that he observed "a lot of breaks in the [boom] cable," as early as April 18, (Supp. Appendix at 1119), and that these so-

called "hairline fractures," which numbered at least six in one lay, caused him to check the "repair" box for the boom cable during his April 28 inspection, (Appendix at 38-39). He further testified that Mountain States' safety policy required that operations involving equipment with the "repair" designation cease pending repair, but that the boom cable continued to be used without repair or replacement. (*Id*. at 38.)

Bundy and Shawn Shehane also adjusted their language in trial testimony, leading the ALJ to observe that "[t]his sort of wordplay appears as if it were coached and aimed at mitigating the consequences of their observations" made prior to the accident. (*Id*. at 154.) Contrary to Officer Sotak's testimony that Bundy had described the wires as "broken" and "smashed" such that the boom cable should have been taken out of service, at trial, Bundy characterized the alleged defects as just "some," "a couple," or "a few" cracks in multiple lays. (*Id*. at 31.) Similarly, Shawn Shehane testified that he had seen "cracked wires" in the boom cable during the month of April but, though he could not recall how many, they did not meet the "3 and 6 criteria." (*Id*. at 20-21.) He did confirm that the boom cable was sufficiently worn to warrant a call to Tommy Shehane to order a replacement. (*Id*. at 21.)

The ALJ largely found the testimony of Mountain States' crane operators "generalized and obfuscatory," (*id*. at 154), as they engaged in "verbal gymnastics" by "attempt[ing] to diminish what they saw through the use of hairline distinctions between a 'broken', 'cracked', or 'fractured' wire and generalizations as to the number of deficient wires they observed." (*Id*. at 153). Thus, he found their testimony of little evidentiary weight.

### 3. The Findings of the ALJ

Giving significant weight to "(1) [Officer] Sotak's testimony as to [Shawn] Shehane's and Hutchins' pretrial statements; (2) the Daily Inspection [F]orms; (3) the pretrial statements of the crane operators, which show substantial consistency as to the condition of the boom cable; and (4) the trial testimony of Hutchins, insofar as that testimony is consistent with the other operators' statements to [Officer] Sotak, as well as his own pretrial statements," the ALJ found by a preponderance of the evidence that Mountain States had violated the terms of the Act's wire rope inspection standard. (*Id*. at 156.)

This Court does not set aside the credibility determinations of an ALJ "unless found to be inherently incredible or patently unreasonable." *Absolute Roofing & Const., Inc. v. Sec'y of Labor*, 580 F. App'x 357, 360 (6th Cir. 2014) (quoting *First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1339 (6th Cir. 1987) (internal quotation marks and citations omitted)). While the "reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative action on appeal," upon consideration of the witness testimony, there is ample justification to support the ALJ's conclusions. *Id*.

First, during the investigation, in signed statements or when questioned by Officer Sotak, all three crane operators admitted that they had observed broken wires in the boom cable. Two of the three operators, Hutchins and Bundy, confirmed in their July interviews with Officer Sotak that the crane should have been taken out of service pending replacement of the boom cable. Though Shawn Shehane maintained that the boom cable did not meet the out-of-service criteria, he too stated—up until he was questioned at trial—that he had observed broken wires in the boom cable.

Second, the observations of the crane operators were supported by the Daily Inspection Forms, on which the operators consistently noted that the boom cable needed to be replaced, and that a replacement was ordered, throughout April. This is particularly meaningful given that the "repair" box on the Form mandated the equipment be taken out of service until it could be replaced. According to Kindrat's testimony, the annual inspection also revealed broken wires on the cable. Though Kindrat did not deem these sufficient to constitute a Category II deficiency, he failed to boom down the crane to actually inspect the continuous length of the cable. The ALJ found this "merely perfunctory" inspection contrary to both the requirements of the Act and Mountain States' own policy. *See* 29 C.F.R. §§ 1926.1412(d)(1), (f)(1).

Mountain States argues on appeal that the ALJ could find a violation of the wire rope inspection standard only by expanding the regulation's use of "broken" to include wires that are "cracked" or "fractured," and this would deprive Mountain States of lawful notice in violation of the Fifth Amendment right to due process. (Petitioner Br. at 17-25.) This argument mischaracterizes the ALJ's reasoning, which first found that the boom cable contained a sufficient number of "visible broken wires," within the plain meaning of the word, to constitute a

Category II deficiency.  Only then did the ALJ respond to what he judged to be a disingenuous strategy—developed during the legal proceeding—and implemented by Mountain States between the investigation and the trial.  The ALJ then engaged in a limited interpretation exercise to provide further basis for his initial finding.

The ALJ properly examined the record evidence and the demeanor of the witnesses, and noted meaningful inconsistencies.  The ALJ then explained the reasons for weighing the evidence as he did, including mention that the witnesses' consistent refusal to use their prior descriptive language appeared to have been coached.  Taken on the whole, we conclude that the record evidence and trial testimony adequately support the conclusion that the boom cable suffered from a Category II deficiency prior to the accident.  The unwillingness of Mountain States' witnesses to use the word "broken" at trial is not fatal to the ALJ's finding, which need only be supported by substantial evidence—not a preponderance—to be affirmed on review.  Based on this examination, a reasonable mind could find that Mountain States failed to meet the requirements of the Act's wire rope inspection standard.  *See First Nat'l Monetary Corp.*, 819 F.2d at 1339 (deferring to the ALJ's credibility determination regarding a witness where the ALJ assessed his demeanor and highlighted the portions of the witness's interview that contradicted his trial testimony).

**B.  Condition Four: Knowledge of the Hazardous Condition**

The fourth and final condition for a prima facie violation of the Act requires that the employer knew of the hazardous condition, or could have known through the exercise of reasonable diligence.  *Carlisle Equip. Co.*, 24 F.3d at 792-93.  The knowledge of a supervisor or foreman, depending on the structure of the company, can be imputed to the employer.  *See Danis-Shook Joint Venture XXV*, 319 F.3d at 812 (observing that "the knowledge of a supervisor may be imputed to the employer" and ascribing the foreman's knowledge of his own failure to wear protective gear to the defendant company); *see also Brock v. L.E. Myers Co., High Voltage Div.*, 818 F.2d 1270, 1277 (6th Cir. 1987) ("In cases involving negligent behavior by a supervisor or foreman which results in dangerous risks to employees under his or her supervision, such fact raises an inference of lax enforcement and/or communication of the employer's safety policy.").

1. Actual Knowledge of the Hazardous Condition

The ALJ determined that at least three of Mountain States' employees had actual knowledge of the condition of the boom cable. Shawn Shehane, as foreman and supervisor of a crew, was a "supervisor" for the purpose of the Act, thus his knowledge can be attributed to Mountain States. *See Danis-Shook Joint Venture XXV*, 319 F.3d at 812. Substantial evidence indicates that he had actual knowledge of the boom cable's condition. Shawn was the first to document that the boom cable needed to be replaced. (Appendix at 182.) He subsequently noted on multiple Daily Inspection Forms throughout the month of April that a replacement had been ordered, indicating that the integrity of the boom remained a prominent issue. (*Id*. at 182-89.) He also received information from Hutchins that the cable was "bad." (*Id*. at 182; Supp. Appendix at 1168.) In his signed statement, Shawn acknowledged that he had observed broken wires in the cable; however, he maintained they did not meet the out-of-service criteria. In light of this evidence, the ALJ determined that "[r]egardless of whether [Shawn] concluded, reasonably or not, that what he observed constituted a Category II violation, Shawn saw the cable in a condition that the Court has found violated the terms of the standard." (Appendix at 157-58.) Thus, the ALJ concluded that "[c]learly Shawn Shehane had knowledge of the condition." (*Id*. at 157.)

The ALJ similarly found that Hutchins and Bundy had actual knowledge of the Category II deficiency. (*Id*. at 158-59.) Mountain States disputes this finding on appeal and argues that, even if Hutchins and Bundy did have actual knowledge of a Category II deficiency in the boom cable, the ALJ erred by imputing this knowledge to the company because neither operator was a supervisor. (Petitioner Br. at 32.) Mountain States argues that to hold otherwise would create "a new agency relationship, in violation of due process," by which the "decision that an employee [is] designated as a competent person" would make the employee "automatically an agent of the employer." (*Id*. at 34-35.) Mountain States further contends that this finding wrongfully deprives it of the affirmative defense of unpreventable employee misconduct. (*Id*.)

This court considered a similar argument in *All Erection & Crane Rental Corp. v. Occupational Safety & Health Review Commission*, an unpublished decision with persuasive authority. 507 F. App'x 511 (6th Cir. 2012). There, the employer disputed the attribution of an

employee's knowledge to the company on the basis that the employee was not technically a foreman or supervisor.  *Id*. at 515-16.  A panel of this court agreed with the ALJ that "official status is not controlling" in this inquiry.  *Id*.  Instead, we accepted the ALJ's determination that the employee was a supervisor for the purpose of the company's knowledge because he "was in charge of the crane operations on the site" and was "responsible for the safety of the [equipment at issue]."  *Id*. (citing *Tampa Shipyards, Inc.*, 15 BNA OSHC 1533, at \*6 (Nos. 86–360, 86–469, 1992) ("An employee who has been delegated authority over other employees, even if only temporarily, is considered to be a supervisor for the purposes of imputing knowledge to an employer.")).  The same conclusion is warranted here.

Mountain States attacks the ALJ's decision by attempting to isolate each rationale offered as if the decision rested solely upon that one explanation.  This mischaracterizes the decision.  The ALJ explained the several bases of his decision, drawing support for his finding that Mountain States had actual knowledge of the boom cable's condition from the record evidence of the knowledge of three crane operators, Shawn Shehane, Hutchins, and Bundy—all "competent persons" under the Act.  First, the ALJ imputed to Mountain States the actual knowledge of *foreman* Shawn; then, and "on the other hand," the ALJ determined that Hutchins and Bundy qualified as supervisors under the Act, such that their knowledge could be imputed to Mountain States, because "the crane operators are given sole authority to monitor a crane, with what appears to be little supervision, and can stop work by pulling that crane out of service due to apparent safety hazards."  (Appendix at 158-59.)

This latter, subsidiary argument of the ALJ was based on his factual determination of how employees actually functioned on the work site and does not wrongfully deprive Mountain States of the opportunity to raise affirmative defenses, such as "unpreventable employee misconduct."  Any impact on the litigation stance of Mountain States results from its decision to vest its crane operators with total responsibility to monitor the condition of the crane followed by, according to credible testimony, its failure to halt operations despite repeated reports from all three operators (in the Daily Inspection Forms and, with respect to Hutchins, verbally) that the boom cable was "bad" and needed to be replaced.  To conclude otherwise would incentivize companies to evade accountability by expediently delegating complete and unaccountable

oversight to an employee without the "supervisor" title and then denying that employee's knowledge.

On the record before us, the ALJ's conclusions—based on a number of findings regarding actual knowledge—are supported by substantial evidence.

### 2. Constructive Knowledge of the Hazardous Condition

The Secretary of Labor can show constructive knowledge on the part of a supervisor by establishing by a preponderance of the evidence that knowledge of a hazard could have been obtained through the exercise of reasonable diligence. *See Carlisle Equip. Co.*, 24 F.3d at 793. When considering the question of reasonable diligence, the ALJ looks to a number of factors including: "an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence." *Kokosing Const. Co. v. Occupational Safety & Hazard Review Comm'n*, 232 F. App'x 510, 512 (6th Cir. 2007) (internal quotation marks omitted).

In addition to the requirements of the Act, Mountain States' own policy requires ongoing evaluation of worksites, procedures, and equipment to ensure compliance with the company's safety program. (Appendix at 217.) The policy requires project managers and superintendents to conduct periodic inspections, and supervisors or foremen to (1) "ensure that work is stopped if [an] unsafe condition arises," (2) to "[e]nsur[e] that all equipment is maintained in safe condition," and to "[p]rohibit[] the use of unsafe equipment." (*Id.* at 217-19.)

The ALJ found that, in addition to the actual knowledge of Shawn Shehane, Hutchins, and Bundy, Mountain States had constructive knowledge of the boom cable's condition because reasonable diligence would have revealed the presence of a Category II deficiency. (*Id.* at 156-59.) Bridge superintendent Tommy Shehane was responsible for the foremen working at the construction site and their crews. (*Id.* at 15.) Foreman Shawn Shehane testified that he reported to Tommy in April that the boom cable was showing signs of wear. (*Id.* at 21.) Though Tommy placed the order for a new cable, he never inspected the old one despite its continued use, instead relying on the crane operators to monitor the situation. (*Id.*) Furthermore, there is no evidence in the record that Tommy reviewed the Daily Inspection Forms, even after receiving notice that

the boom cable should be replaced. (*Id*. at 158.) In light of this evidence, the ALJ concluded that "Tommy Shehane, though he may not have observed the condition, had the opportunity to do so and thus had constructive knowledge of the condition." (*Id*.)

Paired with the "perfunctory" annual inspection performed by the equipment manager, who did not boom down the crane for closer inspection after observing two broken wires, a reasonable mind could easily agree that there was "very little supervision … occurring by way of inspection in this particular work area," at least with respect to operation of the crane, and that "management failed to exercise reasonable diligence in supervising its employees, and thus knowledge is established." (*Id*.)

Mountain States complains that the ALJ's reasoning amounts to a finding that effectively nullifies the role of "competent persons" under the Act, because their work must now be overseen by a supervisor or they are inherently supervisors themselves. (Petitioner Br. at 31.) We disagree with this overbroad characterization and the hypothetical policy disasters it predicts. First, this objection ignores the full basis of the ALJ's decision that the employer knew or by exercising reasonable diligence would have known of the violation. (Appendix at 156.) That determination relied upon the failure to satisfy factors including the "employer's obligation to inspect the work area, anticipate hazards, take measures to prevent violations from occurring, adequately supervise employees, and implement adequate work rules and training." (*Id*. at 156-57.) Even without attributing the crane operators' knowledge to Mountain States, there is substantial evidence that the company took a lax approach to supervision regarding the crane and that reasonable diligence would have revealed the deficiency. And as explained above, the ALJ also properly examined the level and quality of supervision of Mountain States over its crane operators as a factor of the constructive knowledge inquiry. *See All Erection & Crane Rental Corp.*, 507 F. App'x at 515-16.

For these reasons, we conclude that the ALJ did not abuse his discretion by finding both actual knowledge and constructive knowledge on the part of Mountain States. The ALJ's holding satisfies the deferential standard of review on appeal and furthers the "underlying policy" in OSHA violation cases to "impose certain duties or standards upon the [c]ompany in an

attempt to prevent the possibility of . . . injury." *Donovan v. Capital City Excavating Co.*, 712 F.2d 1008, 1010 (6th Cir. 1983).

## IV.  CONCLUSION

Based on the foregoing reasoning, we DENY the petition for review.