**William E. BROCK, Secretary of Labor, Petitioner,**

v.

**The L.E. MYERS COMPANY, HIGH VOLTAGE DIVISION, and Occupational Safety and Health Review Commission, Respondents.**

**No. 86–3215.**

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1987.

Decided May 13, 1987.

---

Sandra Lord (argued), Asst. Counsel for Appellate Litigation, Office of the Sol., U.S. Dept. of Labor, Washington, D.C., for petitioner.

John M. Kunst, Jr., Cincinnati, Ohio, Gary E. Becker (argued), for respondents.

Before ENGEL and GUY, Circuit Judges, and PECK, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

The Secretary of Labor petitions this court for review of an order of the Occupational Safety and Health Review Commission reversing the administrative law judge's (ALJ) decision, which had upheld citations issued against L.E. Myers Company (Myers). The Secretary contends that the Commission's decision is not supported by substantial evidence and did not adequately articulate its reasons for failing to credit the findings of the ALJ. We agree and hereby reverse.

## I.

This action arises from an inspection conducted by a compliance officer of the Occupational Safety and Health Administration (OSHA) following the electrocution death of one of Myers' employees. Following the inspection, OSHA issued several citations charging Myers with both serious and nonserious violations of the Occupational Safety and Health Act of 1970 (the Act). 29 U.S.C. § 651 *et seq.* However, the Secretary appeals only the Commission's ruling with respect to the citation for "serious"[1] violation of 29 C.F.R. § 1926.28(a), and we will confine our discussion to that issue only. Section 1926.28(a) provides:

§ 1926.28 Personal protective equipment.

(a) The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.

The citation alleged that Myers had committed a serious violation by exposing employees working without safety belts or other fall protection to a potential fall of 75 feet.

The investigation ensued as the result of an accident in which one employee was killed and another was seriously injured at a construction project near Cincinnati operated by High Voltage Systems, a wholly-owned division of Myers which constructs and installs electrical transmission and distribution equipment. The project required Myers' employees to install rubber covering as insulation on a 13.2 kilovolt energized electrical wire in a congested construction area where Emery Industries, which had contracted with Myers to perform the insulation work, was building an addition to a boiler house. The electrical lines ran a distance of 85 feet between a terminal pole and a tower located atop the boiler house. The terminal pole was about 47 feet high, the roof of the boiler house was about 60 feet from ground level, and the top of the tower was about 80 feet from the ground.

---

**1.** A serious violation is deemed to exist "if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(k).

Although the preferred method of performing this operation called for deadening the high-voltage power lines, Emery refused to do so, whereupon James Kevelder, Myers' district manager for the Cincinnati area, consulted with Robert Sayre, a Myers' foreman, about alternate methods for performing the job. It was finally decided to attempt the job from the roof of the boiler house building by standing a ladder on the roof against the electrical tower supporting the high-voltage wires and having a man mount the ladder and slide the rubber hose down onto the wires. No mention was made of the use of any specific protective equipment during this discussion.

The foreman, Sayre, contacted James Carmac, a journeyman lineman, and Russell Miller, an apprentice lineman, to perform the job. James Carmac testified before the ALJ that he had asked Sayre if they needed to bring any tools or belts with them, and Sayre said, "No, you don't need nothing. All you need is a ladder that is in a shed there at the substation." The work commenced when Sayre, wearing no protective equipment other than rubber gloves, mounted the 28 foot extension ladder on the east side of the tower, and covered most of the energized areas with rubber blankets. He then took the rubber hose which was handed up to him by Carmac, who was standing on a lower rung of the ladder, and began to slip it over the wires. This procedure involved laying a section of hose over the top channel of the tower structure, reaching under the channel and over a diagonal brace, and feeding the interlocking hose onto the line. As the weight of the hose increased, Sayre decided to balance the load by installing hose onto the opposite side. He accordingly dismounted and the ladder was moved. Although it appears that the ladder may have been "tied-off" while Sayre worked from it, Carmac testified that when it was moved, the rope was slack and it no longer appeared to be secured.

At that point, Miller mounted the ladder to continue the procedure from the west side of the tower as Sayre had previously been doing. Although Miller was wearing both rubber gloves as well as sleeves,[2] none of the three men were wearing a safety belt or any other fall protection equipment. A bystander, the manager of another electrical construction firm working at the Emery site, testified at the hearing that observing Miller carrying out this procedure was "like watching a guy struggling on a tight rope, and we at that point were debating whether we should holler at the guy and tell him to get off the thing." Shortly after he began performing the work, Miller, without explanation or warning, fell forward and struck an uncovered energized "pothead" or terminus for the power lines. He was instantly electrocuted, and continued falling until he struck the ground some 85 feet below. Carmac, standing on a lower ladder rung, fell backward onto the roof, suffering broken ribs and other injuries. Sayre, who had been observing from a corner of the roof, was unharmed.

Following investigation of the accident, Myers determined that Sayre was subject to discipline for failing to require the use of any fall protection equipment, such as safety belts and lanyards. Use of such equipment on the Emery project was mandated by Myers own written safety booklet which is distributed to all supervisory personnel. Sayre was placed on a two-week suspension without pay, from which he never returned.[3]

## II.

Myers contested the citation for violation of 29 C.F.R. § 1926.28(a) on the ground that the violation was not chargeable to the company because it had a safety rule requiring the use of safety belts while working at elevated locations and, therefore, the failure to use belts in this instance was unforseeable employee misconduct.

---

**2.** Rubber sleeves fit over the worker's arms and extend all the way to the shoulder area.

**3.** Sayre was not presented to testify at the hearing and his current whereabouts are apparently unknown.

The evidence adduced at the hearing revealed a safety program at Myers which looked good on paper but was routinely disregarded in practice in the Cincinnati district. The formal safety program consisted of: (1) distribution of safety manuals to employees and supervisors, who were required to sign and return a receipt for the manuals; (2) regular safety "tailgate" meetings which were to be conducted by foremen at the worksite; (3) the filing of reports on such meetings with the district manager (here Kevelder); (4) individual pre-job discussions of safety matters; (5) worksite visits by a Myers Safety Supervisor, headquartered in Chicago, whose territory covered the eastern third of the country; and (6) a progressive system of discipline for safety infractions, normally implemented by the district manager. Myers could produce no records showing receipt by either Carmac or Miller of their basic safety booklets nor for the manuals required for supervisory personnel, such as Sayre and Kevelder. No records were produced of *any* tailgate meetings conducted by Sayre, and Carmac reported that he could not remember when a safety meeting had last been held. Kevelder's secretary, Nancy Maher, testified that, prior to the accident, Sayre had not filed any safety reports. Following Miller's death, Kenneth Kesmeyer, HVS's manager out of Toledo, demanded copies of Cincinnati's safety reports. Maher testified that Sayre repaired to a backroom with some pens, a calendar, and a copy of Myers "Tailgate Safety Meeting Guides" and prepared several reports at once.

Kevelder testified that, as district manager, he did not get "actively involved" in the safety program and that it was very seldom necessary to have safety meetings unless something was "really out of the ordinary," although the company's Safety Supervisor, Robert Grandt, testified that it was the district managers who were responsible for training and enforcement of safety matters within their districts. Kevelder further admitted that there had been no specific discussion of safety matters prior to the Emery job at issue, mainly because it would be "insulting [Sayre's] intel-

ligence" to remind him to take normal safety precautions. However, as Carmac's testimony revealed, Sayre specifically stated that no safety belts would be needed on the job and, indeed, he himself did not have his belt on nor did he tie-off while on the ladder as protection against a potential fall. Finally, OSHA's compliance officer testified that "The written program is a fairly effective and thorough program. It is not administered in that manner; therefore, I rated the program as being ineffective."

The ALJ concluded that Myers "has made an effort to institute and implement a safety program of sorts. While this safety program appears on its face to be a workable program, the circumstances surrounding the actions of foreman Sayre on the day of the accident and prior thereto cast serious doubt that the program was effective with respect to the crews he supervised." He credited testimony showing that Sayre did not conduct tailgate safety meetings as mandated and that he "may have falsified reports in this regard." He also relied on Carmac's testimony that Sayre told him belts would not be needed as evidence of the fact that Myers' safety program "was not effectively communicated or enforced." Finally, he credited testimony by Kevelder's secretary and a union representative to the effect that, shortly after the accident, Kevelder stated that he felt good linemen did not need safety belts because they just "get in the way."

In reversing the findings of the ALJ, the Commission concluded that Myers' safety program was both adequate and effectively communicated to its employees, relying primarily on testimony relative to the operation of the program as envisioned by the Safety Director's Office. They cited the compliance officer's testimony for the proposition that Myers' employee training program was not deficient, ignoring the rest of his testimony to the effect that the manner in which it was actually carried out rendered it ineffectual. They further found that "Sayre was a good supervisor" despite the fact that there was testimony presented regarding two incidents on prior jobs which Sayre had supervised wherein

Sayre's judgment and attention to safety matters was called into question. No mention was made of the conflicting testimony specifically credited by the ALJ. The Commission concluded that the Secretary failed to sustain his burden of proving a violation of § 1926.28(a) and vacated the citation.

### III.

The Secretary raises two issues on appeal:

1) whether the Commission erred in placing the burden of proof on the Secretary to establish that the employee misconduct was foreseeable to the employer, and

2) whether the Commission's decision is supported by substantial evidence where it failed to articulate any reasons for discrediting evidence relied on by the ALJ and ignored evidence relative to the actual enforcement and communication of Myers' safety program to its employees.

We address these issues *seriatim.*

### A. *The Burden of Proof.*

The Occupational Safety and Health Act's stated purpose is to provide "so far as possible every working man and woman in the Nation safe and healthful working conditions...." *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 12, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). Its purpose is neither punitive nor compensatory, but rather forward-looking; i.e., to prevent the first accident. *Mineral Industries & Heavy Construction Group, v. OSHRC,* 639 F.2d 1289, 1294 (5th Cir.1981). To implement the statutory purpose, Congress imposed dual obligations on employers to comply both with a "general duty clause" requiring that the employer free the workplace of all recognized hazards, 29 U.S.C. § 654(a)(1), and a "special duty clause" which requires compliance with mandatory occupational safety and health standards issued by the Secretary, 29 U.S.C. § 654(a)(2). In this case, Myers is charged with a breach of the special duty clause by its violation of the standard set forth at 29 C.F.R. § 1926.28(a). This standard mandates that an employer shall require the wearing of appropriate personal protective equipment in all situations where an employee is *both* exposed to a hazardous condition *and* the need for such protective equipment is indicated elsewhere in part 1926. Although the current version of the standard uses the disjunctive "or" with respect to these separate clauses, its original version used the conjunctive "and" to indicate that both conditions must be satisfied. The Commission held that the change to "or" was invalidly promulgated by the Secretary and required reinstatement of the prior interpretation mandating that both conditions be met, and the Secretary expressly declined to challenge that ruling on appeal. Therefore, our analysis will proceed by taking as a given that a violation of *both* parts of § 1926.28(a) must be proven.[4]

Although Myers does not contest the facts that neither the foreman, Sayre, nor Carmac and Miller were wearing safety belts, that such belts would have been appropriate fall protection on the Emery job, that risk of a fall was a recognized hazard attendant upon a job performed from a ladder over 75 feet above ground level, and that § 1926.105(a)[5] "indicates the need"

---

**4.** This court has held that "§ 1926.28(a) requires an employer to require the wearing of appropriate safety equipment by his employees whenever a reasonably prudent employer, concerned with the safety of his employees, would recognize the existence of a hazardous condition and protect against that hazard by the means specified in the citation." *Ray Evers Welding v. Occupational Safety,* 625 F.2d 726, 731 (6th Cir. 1980). However, that case arose prior to the Commission's invalidation of the disjunctive version of the regulation.

**5.** § 1926.105 Safety nets.

(a) Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical.

Although this standard explicitly refers only to "Safety nets," the Commission as well as several courts of appeals have interpreted this standard to include safety belts as well as the other listed items as appropriate means of fall protection. *See Southern Colorado Prestress Co. v. OSHRC,* 586 F.2d 1342, 1350 (10th Cir.1978); *Brennan v.*

for protective equipment where the "workplace is more than 25 feet above the ground," [6] Myers nevertheless argues that these facts are insufficient to prove the Secretary's case. They contend that, since it is clear that Congress did not intend employers to be insurers against all accidents, but only those which are preventable, that when an employer alleges the existence of a comprehensive safety program which renders noncompliance unforseeable, the Secretary carries the burden of proving the insufficiency of that program. We disagree.

■ As Myers points out, there is a split among the circuits with respect to this question. Several circuits have held that an allegation of unforseeable employee misconduct constitutes an affirmative defense to be pleaded and proved by the employer. *See, e.g., Forging Industry Ass'n v. Secretary of Labor,* 773 F.2d 1436, 1450 (4th Cir.1985) (en banc) (unforseeable employee misconduct constitutes an affirmative defense); *Daniel International Corp. v. OSHRC,* 683 F.2d 361, 363 (11th Cir.1982) (same); *H.B. Zachry Co. v. OSHRC,* 638 F.2d 812, 818–19 (5th Cir. 1981) (same); *General Dynamics Corp. v. OSHRC,* 599 F.2d 453, 458 (1st Cir.1979) (employer may defend by showing it took all necessary precautions to prevent occurrence of violation); *Danco Construction Co. v. OSHRC,* 586 F.2d 1243, 1246 (8th Cir.1978) (employer bears burden of establishing affirmative defense of unforseeable employee misconduct). Other circuits place the burden of disproving unforseeable employee misconduct on the Secretary. *See Capital Electric Line Builders of Kansas v. Marshall,* 678 F.2d 128 (10th Cir.1982); *Pennsylvania Power and Light v. OSHRC,* 737 F.2d 350, 357 (3d Cir.1984) (Secretary bears the burden of proving that supervisor's failure to comply with standard was forseeable).[7] We are persuaded that the appropriate resolution of this question is to regard a claim of unforseeable employee misconduct as an affirmative defense to be proved by the employer after the Secretary has made out a *prima facie* case of a violation of the Act.

*Southern Contractors Service,* 492 F.2d 498 (5th Cir.1974).

6. Myers puts forth an argument in this regard that we must address. They contend that § 1926.105(a) should be read only to require an employer to utilize *either* a safety net or *any* other enumerated safety device—including a "safety belt" or a "ladder." Therefore, they argue, since Myers undisputedly provided a ladder upon which the involved employees could stand, the ladder itself was sufficient fall protection and no other safety equipment was mandated.

The Commission itself has acknowledged that § 105(a) "is not satisfied simply by the use of one of the devices listed in that section without regard to whether such use provides adequate fall protection to employees." *National Indus. Conductors, Inc.,* 90 O.S.H. Cas. (BNA) 1871, 1872 (Rev.Comm'n 1981). *See also Brock v. L.R. Willson & Sons, Inc.,* 773 F.2d 1377, 1384 (D.C.Cir.1985) (device used must be capable of providing protection against the type of hazard to which employees are exposed). Moreover, in its brief to the Commission, Myers specifically conceded that safety belts should have been used on this project.

7. Despite the *Pennsylvania Power & Light* court's holding, it also stated that "[i]n cases where the Secretary proves that a company supervisor had knowledge of, or participated in, conduct violating the Act, we do not quarrel with the logic of requiring the company to come forward with some evidence that it has undertaken reasonable safety precautions." Moreover, we observe that the court's conclusion was predicated on the presence of an adequate safety program and the unblemished safety record of the involved supervisor.

We also observe that the Tenth Circuit has itself issued a conflicting case in *Austin Bldg. Co. v. OSHRC,* 647 F.2d 1063 (10th Cir.1981). In *Austin,* the court held:

The Secretary has the burden of showing that the employer knew or, with the exercise of reasonable diligence, could have known of the likelihood of the noncomplying condition or practice. The employer may *defend* by showing that the violation was an unforseeable occurrence. Evidence that the employer effectively communicated and enforced safety policies to protect against the hazard permits an inference that the employer justifiably relied on its employees to comply with the applicable safety rules and that violations of these safety policies were not forseeable or preventable.

*Id.* at 1067–68 (emphasis added). *See generally* Annotation, *Employee Misconduct as Defense to Citation, Issued Pursuant to O.S.H. Act, Arising Out of Alleged Violation of Standards Resulting in Death or Personal Injury of Employee,* 59 A.L.R.Fed. 395 (1982).

■ In cases involving negligent behavior by a supervisor or foreman which results in dangerous risks to employees under his or her supervision, such fact raises an inference of lax enforcement and/or communication of the employer's safety policy. *National Realty and Construction Co., Inc. v. OSHRC*, 489 F.2d 1257, 1267 n. 38 (D.C.Cir.1973). *See also Donovan v. Capital City Excavating Co., Inc.*, 712 F.2d 1008, 1010 (6th Cir.1983) (actions of supervision are imputed to the company). However, the proper focus in employee misconduct cases is on the effectiveness of the employer's implementation of its safety program and not on whether the employee misconduct is that of a foreman as opposed to an employee. Congress has specifically imposed on the employer the "responsibility to assure compliance by his own employees. Final responsibility for compliance with the requirements of this Act remains with the employers." S.Rep. 1282, 91st Cong. 2d Sess. 10–11, *reprinted in* 1970 U.S. Code Cong. & Admin.News 5177, 5182. The statutory duty to assure compliance with standards issued under the Act includes the obligation to prevent hazardous noncomplying conduct by employees. "[A]n instance of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous character, at the moment of its occurrence. Conceivably, such conduct might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees." *National Realty*, 489 F.2d at 1267 n. 37. Since the Act itself places upon the employer the responsibility of taking all reasonable steps to eradicate preventable hazards, "including imposing work rules, communicating the rules to employees, and providing training, supervision and disciplinary action designated to enforce the rules," *Forging Industries*, 773 F.2d at 1450, the Secretary makes out a *prima facie* case of the employer's awareness of a potentially preventable hazard upon the introduction of proof of the employer's failure to provide adequate safety equipment or to properly instruct its employees on necessary safety precautions. *See Bren-*

*nan v. OSHRC*, 511 F.2d 1139, 1143 n. 5 (9th Cir.1975) ("Proof of an employer's failure to provide guardrails, safety equipment, instructions, or the like, would establish a *prima facie* case of an employer's knowledge of its own acts of omission."); *Danco Construction Co. v. OSHRC*, 586 F.2d at 1246 (employer may not "fail to properly train and supervise its employees and then hide behind its lack of knowledge concerning their dangerous working practices.").

■ Thereafter, an employer may defend the citation on the ground that, due to the existence of a thorough and adequate safety program which is communicated and enforced as written, the conduct of its employee(s) in violating that policy was idiosyncratic and unforseeable. By its nature, information with respect to the implementation of its written safety program will be in the hands of the employer, and it is not unduly burdensome to require it to come forward with such evidence. If the employer's evidence preponderates, it has successfully established the defense of unforseeable employee misconduct. We emphasize that the employer who wishes to rely on the presence of an effective safety program to establish that it could not reasonably have foreseen the aberrant behavior of its employees must demonstrate that program's effectiveness in practice as well as in theory.

B. *Substantiality of the Evidence.*

■ Factual findings of the Commission are conclusive if supported by substantial evidence in the record as a whole. 29 U.S.C. § 660(a). However, when the Commission reverses the factual findings of the ALJ, who had the unique opportunity of observing the demeanor of the witnesses and accepting or rejecting their testimony based on those observations, the Commission must articulate reasons for its failure to credit those findings. *Citizens State Bank v. FDIC*, 718 F.2d 1440, 1444 (8th Cir.1983); *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255, 1264 (4th Cir.1974) (administrative agency must explain grounds for rejection of ALJ's disposition).

In the case at bar, it is clear that the Commission chose to accept Myers' evidence as to the adequacy of its written safety program while selectively ignoring testimony, credited by the ALJ, which showed that the program *in practice*, at least in Kevelder's district, and more specifically with respect to Sayre personally, was not only ignored but actively disregarded.[8] The Commission gave no reasons for its failure to accept the factual findings made by the ALJ. Under these circumstances, we do not find the Commission's conclusion supported by substantial evidence and it will therefore be REVERSED.

PETITION GRANTED.

John G. Paleudis (argued), Hanlon, Duff & Paleudis, Co., L.P.A., St. Clairsville, Ohio, for petitioner.

Daniel A. Manring (argued), Columbus, Ohio, Benefits Review Bd., Michael J. Denney, Thomas L. Holzman, Office of the Solicitor, Ellen L. Beard (argued), U.S. Dept. of Labor, Washington, D.C., for respondents.

---

**8.** *See, e.g.,* testimony establishing that, when asked if belts or other special equipment would be necessary, Sayre said "no". Further, Carmac testified that after he saw what the job entailed, he "would have put a lanyard on if I had one." He had intentionally left his safety equipment at his other job site in reliance on Sayre's assurance that it would not be necessary.