# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CENTRAL STEEL, INC., | DIVISION ONE |
| Appellant, | No. 82021-4-I |
| v. | (consol. with No. 82085-1-I) |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | PUBLISHED OPINION |
| Respondent. | |

DWYER, J. — Central Steel, Inc., appeals one citation issued by the Department of Labor and Industries (the Department) pursuant to the Washington Industrial Safety and Health Act of 1973[1] (WISHA). Central Steel contends that, in affirming this citation, the Board of Industrial Insurance Appeals (the Board) improperly held Central Steel strictly liable for the misconduct of one of its employees. Central Steel also asserts that substantial evidence does not support the Board's finding that its employee was exposed to a fall hazard. Finally, Central Steel contends that the Board erred by finding that Central Steel knew of the violative condition. Because Central Steel fails to establish an entitlement to relief on any of its claims, we affirm.

I

Central Steel and McClone Construction Company were subcontractors for the construction of a multistory residence hall at Seattle University. Central

---

[1] Ch. 49.17 RCW.

Steel was hired "[t]o place the rebar in the building and the post-tension cable." In December 2017, nine levels of the residence hall were under construction. A "cattle guard," or barrier, separated the ninth level into two sections: a northern section and a southern section. The northern section was designated as a leading-edge zone.[2] McClone constructed the leading edge on the ninth level.

Located at the cattle guard was a sign, which read "McClone Construction Company Personnel Only, Leading Edge Danger, Fall Protection Required Beyond This Point." An employee of McClone testified that, while workers were located on the northern section of level nine, they were required "to be 100 percent tied off at all times." Fall protection equipment was required in the northern section of level nine because the floor consisted of "an open steel skeleton," and workers were in the process of "putting down plywood [and] other types of materials to make a covering over that" skeleton. Furthermore, as another McClone employee testified, "[t]here might be areas where, in this building for instance, underneath, the piers had not been completely supported." The ninth level of the structure was approximately 90 feet above ground level.

Before workers entered the northern section of level nine, they were required to wear a full-body harness and attach to the harness a retractable device known as a "yo-yo." The yo-yo was designed to "arrest a fall," should the occasion arise. Once the workers accessed the location of the northern section where they planned to work, they were to attach a positioning hook, or lanyard, to

---

[2] "**Leading edge** means the advancing edge of a floor, roof, or formwork which changes location as additional floor, roof, or formwork sections are placed, formed, or constructed." Former WAC 296-155-24603 (2016).

the rebar of the structure. The positioning hook was designed "to stop [a fall] from happening to begin with." When the workers planned to exit the leading-edge zone, they were required to reattach the yo-yo, detach the positioning hook, and then "walk back into the safe zone."

On December 30, 2017, Central Steel employees Nicholas Hofmann and Ray Estores were assisting in the construction of a structure located on the northern section of the ninth level that was known as the "north core." The north core was an empty vertical shaft leading to the ground level in which an elevator would eventually be placed. On that day, Hofmann and Estores were the only Central Steel employees working on the residence hall. Hofmann was a journey-level worker. Estores was an apprentice. Joshua Ruckle, a general foreperson employed by Central Steel, testified that Hofmann was designated as the "supervisor" for the day.

Hofmann and Estores were assigned "[t]o tie back the rebar elements" inside the north core. Prior to accessing the northern section of the ninth level, Hofmann and Estores each wore a harness and each attached a yo-yo to his harness. Upon reaching the north core, Hofmann and Estores attached their positioning hooks to the rebar on the north core. Hofmann and Estores then detached the yo-yos from their harnesses.

After Hofmann and Estores finished working on the north core, they "climbed down" to the deck on the ninth level. Hofmann testified that, shortly after he descended onto the deck, Hofmann heard Estores's "wall-gear jingle." Hofmann then "looked back" and noticed that Estores "was gone." Alfred How, a

3

McClone employee who was also on the ninth level at that time, informed Hofmann that Estores had fallen. How had heard the sound of a "loud crack," which he attributed to plywood decking on the ninth level breaking.

Indeed, Estores had fallen approximately 90 feet onto a concrete slab located at the bottom of the north core. He did not survive. An expert witness testified that Estores fell because "one of the legs of the lanyards he was using was attached to an incompatible object."

Hofmann testified that, after he was informed that Estores had fallen, he "stopped tying off" by taking his "lanyard off the rebar." How testified that, when Hofmann detached from his fall protection equipment, Hofmann was "[r]oughly about 10 feet" from the leading edge. Hofmann testified that he then "started booking it downstairs" in order to check on Estores.

That same day, the Department began investigating the fatality. On June 22, 2018, the Department cited Central Steel pursuant to WISHA for a single "serious" violation of former WAC 296-155-24609(1) (2016).[3] Two incidences served as independent bases for the citation. First, the citation provided that Estores "did not have his fall protection attached to a proper attachment." Second, the citation stated that "[t]wo Employees were exposed to falls of 90 feet to the ground level, which resulted in the death of one worker and the possibility of severe disabling injuries or death to the other."

---

[3] Former WAC 296-155-24609(1) provides: "The employer shall ensure that the appropriate fall protection system is provided, installed, and implemented according to the requirements in this part when employees are exposed to fall hazards of four feet or more to the ground or lower level when on a walking/working surface."

On July 6, 2018, Central Steel appealed the citation. On October 4, the Department issued a corrective notice of redetermination, which affirmed the issuance of the citation. On October 9, Central Steel appealed the corrective notice of redetermination.

On June 4, 2019, a two-day hearing commenced before an industrial appeals judge. On September 26, the industrial appeals judge entered a proposed decision and order, which affirmed the corrective notice of redetermination solely on the basis that "Central Steel committed a serious violation of WAC 296-155-24609(1) because its employee, acting in a supervisory role, failed to remain 100 percent tied off in an area where he was required to be tied off." Conclusion of Law 2. The industrial appeals judge declined to affirm the citation on the alternative basis that Estores was not attached to a compatible anchor point.

Notably, the industrial appeals judge found:

Because Mr. Hofmann first stopped tying off while at the corner of the north core, he was within 20 feet of the leading edge and was in the zone of danger. He was exposed to a fall hazard of approximately 90 feet. Had he suffered harm from the fall hazard, it would have been serious physical injury or death.

Finding of Fact 8.

Furthermore, the industrial appeals judge found that, "[b]ecause Mr. Hofmann was acting as a supervisor, his knowledge of his own violation is imputed to the employer. Central Steel knew of the violative condition." Finding of Fact 7.

On November 7, 2019, both Central Steel and the Department petitioned for review of the proposed decision and order to the Board. On November 22, the Board entered an order denying the petitions for review. The order corrected several "clerical errors" in the proposed decision and order but otherwise provided that "[t]he Proposed Decision and Order becomes the final order of the Board."

On December 9, 2019, Central Steel appealed the Board's order denying its petition for review to the superior court. On October 19, 2020, the superior court entered an order affirming the Board's order.[4]

Central Steel appeals.

II

Central Steel contends that "the Board's affirmation of the fall protection violation improperly held Central Steel to a strict liability standard."[5] This is so, Central Steel avers, because "Mr. Hofmann was reacting to an unforeseeable emergency situation when he unclipped from his fall protection, which Central Steel could not have foreseen or prevented."[6] We disagree. Central Steel was not held strictly liable for Hofmann's violation.

To establish a "serious" WISHA safety violation, the Department is required to prove that

---

[4] In the superior court, the Department asserted that the citation should also be affirmed on the basis that Estores was not attached to a compatible anchor point. The superior court declined to affirm the citation on this basis. The Department cross-appealed from the superior court's order in cause No. 82085-1-I. However, in its response brief, the Department states that "it has now decided not to pursue the appeal." Br. of Resp't at 12 n.4. Therefore, the issue is deemed abandoned.

[5] Br. of Appellant at 20.

[6] Br. of Appellant at 20.

> (1) the cited standard applies, (2) the employer did not meet the standard, (3) employees were exposed to, or had access to, the violative condition, (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition.

Shimmick Constr. Co. v. Dep't of Labor & Indus., 12 Wn. App. 2d 770, 779, 460 P.3d 192 (2020).

In other words, "the 'Department must . . . prove an element of knowledge on the part of the employer' before holding [the employer] liable." Potelco, Inc. v. Dep't of Labor & Indus., 191 Wn. App. 9, 34, 361 P.3d 767 (2015) (internal quotation marks omitted) (quoting In re Longview Fibre Co., No 02 W0321, 2003 WL 23269365, at *1, 2003 WA Wrk. Comp. LEXIS 229, at *3 (Wash. Bd. of Indus. Ins. Appeals Nov. 5, 2003)).

To establish the knowledge requirement of a WISHA violation, the Department does not bear the burden to prove that the violation was foreseeable. Potelco, Inc. v. Dep't of Labor & Indus., 194 Wn. App. 428, 440, 377 P.3d 251 (2016) (stating that "the applicable standard here is whether [the employer] *knew or should have known* of the violative condition—not whether the behavior that led to the violation was *foreseeable*"). Rather, once the Department establishes a prima facie case of a WISHA violation, the burden shifts to the employer "who can avoid a finding against it if it can establish that 'unpreventable employee misconduct' was the actual cause of the violation." J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 46, 156 P.3d 250 (2007) (quoting RCW 49.17.120(5)(a)). To show unpreventable employee misconduct, the employer

7

must establish the following four statutory elements:

> (i) A thorough safety program, including work rules, training, and equipment designed to prevent the violation;
> (ii) Adequate communication of these rules to employees;
> (iii) Steps to discover and correct violations of its safety rules; and
> (iv) Effective enforcement of its safety program as written in practice and not just in theory.

RCW 49.17.120(5)(a).

Put differently,

> "[a]n employer may defend the citation on the ground that, due to the existence of a thorough and adequate safety program[,] which is communicated and enforced as written, the conduct of its employee(s) in violating that policy was idiosyncratic and unforeseeable."

BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 113, 161 P.3d 387 (2007) (second alteration in original) (quoting Brock v. L.E. Myers Co., High Voltage Div., 818 F.2d 1270, 1277 (6th Cir. 1987)).

Central Steel contends that it was held to a strict liability standard because Hofmann's conduct was unforeseeable. To the contrary, Central Steel was not held to a strict liability standard. The Department was required to prove that Central Steel either "'knew or, through the exercise of reasonable diligence, could have known of the violative condition.'" Potelco, 191 Wn. App. at 34 (quoting Frank Coluccio Constr. Co. v. Dep't of Labor & Indus., 181 Wn. App. 25, 36-37, 329 P.3d 91 (2014)). Indeed, the Board found that "Central Steel knew of the violative condition." Finding of Fact 7.

After the Department established a prima facie case of a WISHA violation, the burden shifted to Central Steel to establish that Hofmann's conduct

amounted to unpreventable employee misconduct. Central Steel did not raise this defense before the Board; rather, in its petition for review of the proposed decision and order, Central Steel asserted merely that Hofmann's conduct was not foreseeable. However, "[a]n employer asserting the defense must prove each element." Potelco, 194 Wn. App. at 435. Because Central Steel did not attempt to demonstrate all of the elements under RCW 49.17.120(5)(a)(i)-(iv) when it was before the Board, Central Steel waived any claim on appeal that it was entitled to the unpreventable employee misconduct defense.[7] See RAP 2.5(a); In re Marriage of Buecking, 179 Wn.2d 438, 454-55, 316 P.3d 999 (2013).

Accordingly, Central Steel was not held strictly liable for Hofmann's violation.

III

Central Steel asserts that the Board's finding that Hofmann was exposed to a fall hazard is not supported by substantial evidence. This is so, Central Steel avers, because (1) Hofmann was reacting to an emergency situation when he detached from his fall protection equipment, and (2) Hofmann was 20 feet from the leading edge and running away from the leading edge when he detached from his fall protection equipment. Because substantial evidence supports a finding that Hofmann was exposed to a fall hazard, we disagree.

WISHA governs appellate review of a Board decision. RCW 49.17.150(1). We review the Board's decision based on the record before the agency.

---

[7] In any event, Central Steel does not assert on appeal that it established all of the elements that are required to be proved under the unpreventable employee misconduct defense. Instead, Central Steel merely contends that Hofmann's violation was unforeseeable. Again, this is insufficient. See Potelco, 194 Wn. App. at 435.

*Shimmick*, 12 Wn. App. 2d at 778. The Board's findings of fact are conclusive if they are supported by substantial evidence. *Shimmick*, 12 Wn. App. 2d at 778 (citing *Erection Co. v. Dep't of Labor & Indus.*, 160 Wn. App. 194, 202, 248 P.3d 1085 (2011); RCW 49.17.150(1)). Evidence is substantial if it is enough to convince a fair-minded person of the truth of the stated premise. *Shimmick*, 12 Wn. App. 2d at 778. We do not reweigh the evidence on appeal. *Shimmick*, 12 Wn. App. 2d at 778 (citing *Potelco*, 194 Wn. App. at 434). Instead, we construe the evidence in the light most favorable to the party that has prevailed in the administrative proceeding. *Shimmick*, 12 Wn. App. 2d at 778. When substantial evidence supports the Board's factual findings, we decide whether those findings support the Board's conclusions of law. *J.E. Dunn Nw.*, 139 Wn. App. at 42.

Here, the Board found:

> Because Mr. Hofmann first stopped tying off while at the corner of the north core, he was within 20 feet of the leading edge and was in the zone of danger. He was exposed to a fall hazard of approximately 90 feet. Had he suffered harm from the fall hazard, it would have been serious physical injury or death.

Finding of Fact 8.

We have explained that "the zone of danger is 'that area surrounding the violative condition that presents the danger to employees which the standard is intended to prevent.'" *Shimmick*, 12 Wn. App. 2d at 785 (internal quotation marks omitted) (quoting *Sec. of Labor v. Evergreen Techs., Inc.*, 18 BNA OSHC 1528, 1998 WL 518250, at *7, 1998 OSAHRC LEXIS 68, at *17 (No. 98-0348)). Notably, "the Department need not prove actual employee exposure to prove a serious violation." *Shimmick*, 12 Wn. App. 2d at 785. "Rather, an employer

exposes its workers if they 'were exposed to, or had access to, the violative condition.'" Shimmick, 12 Wn. App. 2d at 785 (internal quotation marks omitted) (quoting Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2003)). As such, "[t]he Department must show by 'reasonable predictability that, in the course of [the workers'] duties, employees will be, are, or have been in the zone of danger.'" Shimmick, 12 Wn. App. 2d at 785 (internal quotation marks omitted) (alteration in original) (quoting Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus., 136 Wn. App. 1, 5, 146 P.3d 1212 (2006)).

Substantial evidence supports the Board's finding that Hofmann was exposed to a fall hazard when he detached from his fall protection equipment. The ninth level of the structure was approximately 90 feet above ground level. A McClone employee testified that fall protection equipment was required on the northern section of level nine because "[t]here might be areas where, in this building for instance, underneath, the piers had not been completely supported." Indeed, prior to realizing that Estores had fallen, How "heard a really loud crash, like something was falling apart." How ultimately attributed this sound to plywood decking on the ninth level breaking. After hearing the crashing sound, How approached the north core, "looked down, . . . [and] s[aw] Ray down below inside the core." How then informed Hofmann that Estores had fallen.

Hofmann testified that, after being informed that Estores had fallen, he "stopped tying off" by taking his "lanyard off the rebar." How testified that, when Hofmann detached from his fall protection equipment, Hofmann was "[r]oughly

11

about 10 feet" from the leading edge.[8]  Hofmann stated that he then "started booking it downstairs" in order to check on Estores.  From this evidence, a fair-minded person could find that Hofmann, without being attached to a fall protection system, traversed a structure that had already proved to be not fully supported.  Therefore, substantial evidence supports the Board's finding that Hofmann was exposed to a fall hazard.

Central Steel suggests that the Board's finding that Hofmann was exposed to a fall hazard is not supported by substantial evidence because Hofmann was reacting to an unforeseeable emergency situation when he detached from his fall protection equipment.[9]  However, whether Hofmann was reacting to an emergency situation has no bearing on whether substantial evidence supports a finding that Hofmann was exposed to a fall hazard.

Next, Central Steel asserts that the Board's finding is not supported by substantial evidence "because [Hofmann] was approximately 20 feet from the edge when he unclipped from his fall protection, he was running away from the

---

[8] Central Steel asserts that this "testimony was found to be not credible by the Board." Reply Br. of Appellant at 7.  Contrary to Central Steel's assertion, the Board did not find that this testimony was not credible.  With regard to How's credibility, the Board's opinion stated merely that How's "stated reason for his conclusion" that "he did not see . . . Hofmann tied off," namely, that "How was attached to the only yo-yo," "is not persuasive in the context of all the testimony." However, the Board made no finding regarding the credibility of How's testimony that Hofmann was "[r]oughly about 10 feet" from the leading edge.  Notably, How's estimation of Hofmann's distance from the leading edge was determined "[a]t the end [of] when [How had] seen" Hofmann. Hofmann testified that, immediately after How informed him that Estores had fallen, Hofmann "took [his] lanyard off the rebar, and then . . . started booking it downstairs."  From this evidence, a fair-minded person could find that Hofmann was approximately 10 feet from the leading edge when he detached from his fall protection equipment.

[9] Central Steel's issue statements provide, in pertinent part:
   A.  Is the Board's determination that Mr. Hofmann was exposed to a fall hazard supported by substantial evidence when he was reacting to an emergency situation when he unclipped from his fall protection, which Central Steel could not have foreseen or prevented?
Br. of Appellant at 2 (bold face omitted).

leading edge towards the finished southside's stair tower after he unclipped from his fall protection, and he had no work to do near the leading edge after he unclipped from his fall protection."[10]  However, contrary to Central Steel's assertion, the Board did not find that Hofmann was approximately 20 feet from the leading edge when he detached from his fall protection equipment.  Rather, the Board found that Hofmann "was *within* 20 feet of the leading edge."  Finding of Fact 8 (emphasis added).  This finding is supported by substantial evidence.  Indeed, How testified that, when Hofmann detached from his fall protection equipment, Hofmann was "[r]oughly about 10 feet" from the leading edge.

Given Hofmann's proximity to the leading edge when he detached from his fall protection equipment, substantial evidence supports a finding that Hofmann was exposed to a fall hazard.  Moreover, as already explained, substantial evidence supports a finding that Hofmann was exposed to a fall hazard when he traversed the northern section of level nine without being attached to a fall protection system.

Accordingly, substantial evidence supports the Board's finding that Hofmann was exposed to a fall hazard.

IV

Central Steel next contends that the Board erred by finding that Hofmann's knowledge of his own violation was imputed to Central Steel.  This is so, Central Steel asserts, because Hofmann was a journey-level worker and was not a supervisor within Central Steel's corporate hierarchy.  Additionally, Central

---

[10] Br. of Appellant at 20.

Steel asserts that, even if Hofmann were a supervisor, his knowledge of his own violation cannot be imputed to Central Steel. Again, we disagree. The Board did not err by finding that Hofmann's knowledge of his own violation was imputed to Central Steel.

A

To establish a WISHA safety violation, the Department is required to prove, in part, that the "'employer knew or, through the exercise of reasonable diligence, could have known of the violative condition.'" Potelco, 191 Wn. App. at 34 (quoting Frank Coluccio Constr. Co., 181 Wn. App. at 36-37). "[W]hen a supervisor has actual or constructive knowledge of a safety violation, such knowledge can be imputed to the employer." Potelco, 194 Wn. App. at 440 (citing Danis-Shook Joint Venture XXV v. Sec'y of Labor, 319 F.3d 805, 812 (6th Cir. 2003); N.Y. State Elec. & Gas Corp. v. Sec'y of Labor, 88 F.3d 98, 105 (2d Cir. 1996); Ga. Elec. Co. v. Marshall, 595 F.2d 309, 312 (5th Cir. 1979)). Notably, an employer may delegate supervisory authority to an employee whose job title is not that of a supervisor:

> [The Occupation Safety and Health Review Commission] imputed to the Company the regular boom truck operator's actual knowledge [of the violative condition], and from this knowledge it imputed to the Company recognition of the hazard. The [administrative law judge] found that the employer had delegated supervisory authority to the regular boom truck operator, D.R. Carroll. Although Carroll's job title was not that of a superintendent or foreman, there is sufficient evidence to show that he in fact exercised supervisory authority. Therefore, D.R. Carroll's knowledge could be imputed to the Company.

Ga. Elec. Co., 595 F.2d at 321 (footnote omitted).[11]

---

[11] When determining the standards provided under WISHA, "we may look for guidance to decisions interpreting the Washington statute's federal counterpart, the Occupational Safety and

Here, the Board found that Hofmann was acting as a supervisor and that his knowledge of his own safety violation was imputed to Central Steel:

Because Mr. Hofmann was acting as a supervisor, his knowledge of his own violation is imputed to the employer. Central Steel knew of the violative condition.

Finding of Fact 7.

Substantial evidence supports the Board's finding that Hofmann was acting as a supervisor. Indeed, Joshua Ruckle, a general foreperson employed by Central Steel, testified that Hofmann was designated as the "supervisor" for the day that Hofmann engaged in the safety violation:

Q. Did you know if there would be any foreman from Central Steel for Nick [Hofmann] and Ray [Estores] on the following day?
A. I knew that Nick was going to be the supervisor, yes, for that day.

Additionally, Central Steel's superintendent testified that Hofmann was responsible for Estores:

Q. . . . As far as your understanding, Nick [Hofmann] was the individual from Central Steel that was responsible for Ray Estores on December 30th of 2017, correct?
A. Correct.

Finally, Hofmann testified that he was responsible for Estores:

Q -- I apologize[.] I was just referencing in the day that -- December 30th of 2017 --
A Uh-huh[.]
Q -- you were the senior employee that was on site, so on that day you had the responsibility to mentor, correct --
A Right[.]
Q -- Ray, correct?
A Correct[.]

---

Health Act, 29 U.S.C. ch. 15." Asplundh Tree Expert Co. v. Dep't of Labor & Indus., 145 Wn. App. 52, 60, 185 P.3d 646 (2008).

Because Hofmann was delegated and exercised supervisory authority on the day that he detached from his fall protection equipment, the Board did not err by finding that Hofmann was a supervisor. See Ga. Elec. Co., 595 F.2d at 321. Moreover, because Hofmann was acting as a supervisor, the Board did not err by finding that his knowledge of the violation was imputed to Central Steel. See Potelco, 194 Wn. App. at 440.

B

Central Steel asserts that the Board erred by imputing Hofmann's knowledge of the violation to Central Steel because Hofmann was a journey-level worker and, as such, he was not a supervisor in Central Steel's corporate hierarchy. In support of this argument, Central Steel cites to the Occupational Safety and Health Review Commission's (the Commission) decision in Secretary of Labor v. Mountain States Telephone and Telegraph Co., 9 BNA OSHC 2151, 1981 WL 18811 (No. 13266). In that case, the Commission stated that "a corporate employer can only acquire knowledge through the knowledge of its agents. Therefore, a corporation only has actual or constructive knowledge of a violation if individuals in the corporate hierarchy have such knowledge." Mountain States Tel. & Tel. Co., 1981 WL 18811, at *3.

However, the Commission therein did not address whether an employer may delegate supervisory authority to an employee who is not, by job title, a supervisor within the employer's corporate hierarchy. As already explained, an employer may delegate such supervisory authority to an employee whose job title is not that of a supervisor. See Ga. Elec. Co., 595 F.2d at 321. Because

16

Hofmann was delegated supervisory authority, the Board did not err by finding that he was a supervisor.

C

Central Steel next contends that the Board erred because, according to Central Steel, a supervisor's knowledge of his or her *own* violation cannot be imputed to an employer. In support of this argument, Central Steel directs us to several opinions wherein federal appellate courts have held that a supervisor's knowledge of his or her own violation may be imputed to the employer *only if* the government also establishes that the violation was foreseeable to the employer. See ComTran Grp., Inc. v. United States Dep't of Labor, 722 F.3d 1304, 1316 (11th Cir. 2013); W.G. Yates & Sons Constr. Co. v. Occupational Safety & Health Review Comm'n, 459 F.3d 604, 608-09 (5th Cir. 2006); Pennsylvania Power & Light Co. v. Occupational Safety & Health Review Comm'n, 737 F.2d 350, 357-58 (3d Cir. 1984); Mountain States Tel. & Tel. Co. v. Occupational Safety & Health Review Comm'n, 623 F.2d 155, 158 (10th Cir. 1980); Ocean Elec. Corp. v. Sec'y of Labor, 594 F.2d 396, 401 (4th Cir. 1979).

Notably, in each of these cases, the courts reasoned that, if the government were able to establish employer knowledge merely by demonstrating that a supervisor had knowledge of his or her own misconduct, then the government would be impermissibly relieved of its burden to establish that the violation was foreseeable.[12]

---

[12] In ComTran Group, the Eleventh Circuit explained:
We hold that the Secretary does not carry her burden and establish a prima facie case with respect to employer knowledge merely by demonstrating that a supervisor engaged in misconduct. A supervisor's "rogue conduct" cannot be

imputed to the employer in that situation. Rather, "employer knowledge must be established, not vicariously through the violator's knowledge, but by either the employer's actual knowledge, or by its constructive knowledge based on the fact that the employer could, under the circumstances of the case, foresee the unsafe conduct of the supervisor [that is, with evidence of lax safety standards]." W.G. Yates & Sons Constr. Co., Inc., 459 F.3d at 609 n.8. Without such evidence, a supervisor's misconduct may be viewed as an isolated incident of unforeseeable or idiosyncratic behavior, see Ocean Elec. Corp., 594 F.2d at 401, which is insufficient, by itself, to impose liability under the Act.

722 F.3d at 1316.

In addition, in W.G. Yates & Sons Construction Co., the Fifth Circuit stated: On the facts of this case, [the employer] can be charged with knowledge *only if* [the supervisor's] knowledge of his own misconduct is imputable to [the employer]. The knowledge is imputed *only* if [the supervisor's] conduct was foreseeable. Consequently, the Secretary, not [the employer], bears the burden to establish that the supervisor's violative conduct was foreseeable. Yet, the [administrative law judge] charged [the employer] with knowledge of [the supervisor's] misconduct without any inquiry as to whether the misconduct should have been foreseen by [the employer]. Finding the Secretary had established a serious violation (based only on [the supervisor's] misconduct), the [administrative law judge] then shifted the burden to [the employer] to establish the defense of employee misconduct. By failing to conduct the foreseeability analysis before imputing [the supervisor's] knowledge, the [administrative law judge] effectively relieved the government of its burden of proof to establish a violation of the Act and placed on [the employer] the burden of defending a violation that had not been established.

459 F.3d at 609 (footnote omitted).

Similarly, in Pennsylvania Power & Light Co., the Third Circuit held:
The Secretary seeks to discharge its burden of proving foreseeability by demonstrating that [the employer's] *supervisor* violated the OSHA regulation. The Secretary would have us shift the burden to [the employer] to rebut the inference of foreseeability by proving that [the supervisor's] conduct was unpreventable. . . . We . . . hold . . . that the Secretary may not shift to the employer the ultimate risk of non-persuasion in a case where the inference of employer knowledge is raised only by proof of a supervisor's misconduct. The participation of the company's own supervisory personnel may be evidence that an employer could have foreseen and prevented a violation through the exercise of reasonable diligence, but it will not, standing alone, end the inquiry into foreseeability.

737 F.2d at 357-58 (footnote omitted).

Likewise, in Mountain States Telephone and Telegraph Co., the Tenth Circuit stated: Upon a showing of the supervisor's knowledge, it is not unreasonable to require the employer to defend by showing the failure to prevent violations by subordinates was unforeseeable. But when the noncomplying behavior is the supervisor's own a different situation is presented. [The supervisor] knew he personally violated the safety standards, of course; if we impute that knowledge to the employer—and declare that now the employer must show the noncomplying conduct was unforeseeable—we are shifting the burden of proof to the employer. All the Secretary would have to show is the violation; the employer then would carry the burden of nonpersuasion.

623 F.2d at 158.

Finally, in Ocean Electric Corp., the Fourth Circuit stated that "an imputation of a supervisor's acts to the company in each instance would frustrate the goals behind the Act." 594 F.2d at 399. The court then explained that "the Commission placed the burden on the company to show unforeseeability and unpreventability, and affirmed the citation because no evidence was

However, under WISHA, it is well established that the Department *does not* bear the burden to prove that an employee's misconduct was foreseeable. In Washington Cedar & Supply Co., 119 Wn. App. at 912, the court explained that "there is a significant split among the federal circuit courts as to which party should bear the burden of proof" with regard to the foreseeability of an employee's misconduct. The court then explained that "Washington . . . adopted a statute laying out the elements of the unpreventable employee misconduct *defense* that mirrors the language in Brock." Wash. Cedar & Supply Co., 119 Wn. App. at 912 (emphasis added) (citing RCW 49.17.120(5)(a)(iv)).

In Brock, the Sixth Circuit recognized the split among federal circuit courts regarding which party bears the burden to prove the foreseeability of an employee's misconduct. 818 F.2d at 1276. The court then explained: "We are persuaded that the appropriate resolution of this question is to regard a claim of unforeseeable employee misconduct as an *affirmative defense to be proved by the employer* after the Secretary has made out a *prima facie* case of a violation of the Act." Brock, 818 F.2d at 1276 (first emphasis added).

Consistent with the holding in Brock, we have explained that the Department does not bear the burden to prove that a violation was foreseeable:

> Potelco asserts that [the supervisor] and his crew acted unforeseeably when they disregarded Potelco's repeated warnings and instructions. However, the applicable standard here is whether Potelco *knew or should have known* of the violative condition—not whether the behavior that led to the violation was *foreseeable*—and Potelco presents no evidence that it did not or could not have known of the violation.

presented on the adequacy of [the employer's] safety instruction program." Ocean Elec. Corp., 594 F.2d at 401. The court then held that "the Commission erred, and that the burden of proof should be on the Secretary." Ocean Elec. Corp., 594 F.2d at 401.

<u>Potelco</u>, 194 Wn. App. at 440.

Because, under WISHA, the employer bears the burden to prove that the misconduct of an employee was unforeseeable as a means of establishing an affirmative defense, there is no concern that, by imputing a supervisor's knowledge of his or her own misconduct to the employer, the Department will be relieved of *its* case in chief burden of proof. Indeed, following its decision in <u>Brock</u>, the Sixth Circuit held that the government may establish employer knowledge by demonstrating that a supervisor knew of his or her own violation. <u>Danis-Shook Joint Venture XXV</u>, 319 F.3d at 812 ("[T]he knowledge of a supervisor may be imputed to the employer. Because [the employee] was a foreman and knew of his own failure to wear personal protective equipment, this failure may be imputed to [his employer]." (citation omitted) (citing <u>Brock</u>, 818 F.2d at 1277)).

Additionally, the Seventh Circuit has held that a supervisor's knowledge of his or her own misconduct may be imputed to the employer when the supervisor engaged in the misconduct while acting within the scope of his or her employment:

> Here, [the supervisor] knew that he was violating the rules when he entered the dirty tank in order to kick loose a stuck valve so that he could then drain the tank. His act was in furtherance of [the employer's] tank cleaning business. We thus see no problem with the Commission's decision to impute [the supervisor's] knowledge to [the employer].

<u>Dana Container, Inc. v. Sec'y of Labor</u>, 847 F.3d 495, 499-500 (7th Cir. 2017).[13]

---

[13] In that case, the court explained that "[u]nder Commission precedent the Secretary can satisfy his burden [to establish employer knowledge] without demonstrating any inadequacy or

Furthermore, sound policy supports a rule authorizing the imputation of a supervisor's knowledge of his or her own misconduct to an employer. Indeed, the Commission has previously expressed disagreement with the Tenth Circuit's decision in Mountain States Telephone & Telegraph Co., 623 F.2d 155, wherein the circuit court held that a supervisor's knowledge of his own misconduct was not imputable to the employer:

> We have previously expressed our disagreement with the court's rationale and with a similar holding in Ocean Elec. Corp. v. Secretary of Labor, 594 F.2d 396 (4th Cir. 1979). We believe that the rationale for imputing a supervisor's knowledge to his employer is at least as compelling for violations the supervisor commits himself as for violations committed by his subordinates. "Because the behavior of supervisory personnel sets an example at the workplace, an employer has—if anything—a heightened duty to ensure the proper conduct of such personnel. Second, the fact that a foreman would feel free to breach a company safety policy is strong evidence that implementation of the policy was lax."

Mountain States Tel. & Tel. Co., 1981 WL 18811, at *2 n.2 (citation omitted) (quoting Nat'l Realty & Constr. Co. v. Occupational Safety & Health Review Comm'n, 489 F.2d 1257, 1267 n.38 (D.C. Cir. 1973)).

Significantly, the express purpose of WISHA is "to create, maintain, continue, and enhance the industrial safety and health program of the state, which program shall *equal or exceed* the standards prescribed by the Occupational Safety and Health Act of 1970." RCW 49.17.010 (emphasis added). Although there is a split among federal circuit courts as to whether an

---

defect in the employer's safety program, if a supervisory employee has actual or constructive knowledge of the violation." Dana Container, 847 F.3d at 499 (citing Sec'y of Labor v. Dover Elevator Co., 16 BNA OSHC 1281, 1993 WL 275823, at *7 (No. 91-862)). The court then reasoned that "[t]his path for imputing knowledge is common in employment law" and that "[w]hen an employee is acting within the scope of her employment, her knowledge is typically imputed to the employer." Dana Container, 847 F.3d at 499.

employer's knowledge of a violation may be established by demonstrating that a supervisor knew of his or her own violation, the stated WISHA purpose is best advanced by adopting the analyses of those courts holding that the government regulator may establish employer knowledge by way of such a showing.

Accordingly, the Board did not err by determining that Hofmann's knowledge of his own violation was imputed to Central Steel.

Affirmed.

Dwyer, J.

WE CONCUR:

Chun, J.                    Mann, C.J.